# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————— )
IN RE:  TERRORIST ATTACKS ON ) **Civil Action No. 03 MDL 1570 (GBD) (SN)**
SEPTEMBER 11, 2001 ) **ECF Case**
—————————————————————— )

This document relates to:

*Federal Insurance Co., et al. v. al Qaida, et al.*, No. 03-cv-6978
*Vigilant Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 03-cv-8591
*Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849
*Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-5970
*Cantor Fitzgerald Assocs., et al. v. Akida Inv. Co., et al.*, No. 04-cv-7065
*Pacific Employers Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-7216
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-7279
*Beazley Furlonge Ltd. v. Saudi Binladin Group, Inc., et al.*, No. 16-cv-7456
*Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070
*McCarthy, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8884
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9937
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-117
*DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-450
*Ashton, et al. v. Kingdom of Saudi Arabia*, No. 17-cv-2003
*The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia, et al.*,
    No. 17-cv-2129
*The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-2651
*General Reinsurance Corp., et al. v. Kingdom of Saudi Arabia*, No. 17-cv-3810
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3887
*Arrowood Indemnity Co. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3908
*Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-4201
*Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5174
*Aasheim, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5471

## MEMORANDUM OF LAW IN SUPPORT OF
## RENEWED MOTION TO DISMISS OF THE KINGDOM OF SAUDI ARABIA

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)

August 1, 2017                          *Attorneys for the Kingdom of Saudi Arabia*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ vi

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

    A.    The 9/11 Commission and Later Investigations ....................................................3

    B.    History of These Cases .........................................................................................6

          1.    Judge Casey's Rulings and Related Appeals ...............................................6

          2.    *Doe v. Bin Laden* and the Reopening of These Cases ...............................7

          3.    Proceedings After the 2013 Remand and This Court's 2015
               Ruling.........................................................................................................8

    C.    JASTA and the Present Remand..........................................................................9

ARGUMENT .................................................................................................................10

    I.    Plaintiffs Must Allege and Come Forward with Evidence of a
        Tortious Act Within the Scope of Office, Employment, or Agency
        That Caused the 9/11 Attacks ...........................................................................10

          A.    JASTA Requires an Act by an Official, Employee, or
               Agent Within the Scope of Office, Employment, or Agency ...................11

          B.    JASTA Requires That the Official's, Employee's, or
               Agent's Act Be Tortious ........................................................................12

          C.    JASTA Requires That the Official's, Employee's, or
               Agent's Tortious Act Have Caused Plaintiffs' Injuries ...........................14

               1.    JASTA Requires But-For Causation..............................................14

               2.    JASTA Requires Traditional Proximate Cause ............................15

          D.    JASTA Does Not Change Any Pleading or Evidentiary
               Requirements .........................................................................................18

               1.    Plaintiffs Must Plead Concrete Facts and Come
                    Forward with Competent Evidence ...............................................18

                2.    The 9/11 Report, FBI-CIA Report, and 9/11 Review
                    Report Are Competent Evidence ..................................................20

3. Plaintiffs' Opposing Materials Are Not Competent Evidence ........................................................................ 22

  a. Part Four (the "28 pages") ................................... 22

  b. Affirmations of Former Officials ...................... 22

  c. Preliminary Investigative Materials ................ 23

  d. Other Materials ................................................ 23

II. Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Individual ................................................ 24

 A. The Consolidated Amended Complaint ................................ 24

  1. Omar Al Bayoumi ................................................ 25

   a. No Action Within Scope of Employment or Agency ........................................................... 26

   b. No Tortious Act ............................................... 29

   c. No Causation .................................................... 30

  2. Fahad Al Thumairy ............................................. 31

   a. No Action Within Scope of Employment or Agency ........................................................... 31

   b. No Tortious Act ............................................... 32

   c. No Causation .................................................... 33

  3. Osama Basnan ..................................................... 33

   a. No Action Within Scope of Employment or Agency ........................................................... 33

   b. No Tortious Act ............................................... 34

   c. No Causation .................................................... 34

  4. Saleh Al Hussayen ............................................. 35

  5. Mohammed Al Qudhaieen and Hamdan Al Shalawi .................... 36

   a. No Action Within Scope of Employment or Agency ........................................................... 36

|     |     |     |     | b. | No Tortious Act ........................................................ | 37 |
|     |     |     |     | c. | No Causation ........................................................... | 38 |
|     |     | 6. | Mohammed Jabar Fakihi ........................................... | | | 39 |
|     |     |     |     | a. | No Action Within Scope of Employment or Agency .................................................................. | 39 |
|     |     |     |     | b. | No Tortious Act ........................................................ | 40 |
|     |     |     |     | c. | No Causation ........................................................... | 41 |
|     |     | 7. | Omar Abdi Mohamed ............................................... | | | 42 |
|     |     |     |     | a. | No Action Within Scope of Employment or Agency .................................................................. | 42 |
|     |     |     |     | b. | No Tortious Act ........................................................ | 43 |
|     |     |     |     | c. | No Causation ........................................................... | 44 |
|     | B, | The *Ashton* Complaint ................................................... | | | | 44 |
|     |     | 1. | Omar Al Bayoumi ...................................................... | | | 45 |
|     |     | 2. | Fahad Al Thumairy .................................................... | | | 45 |
|     |     | 3. | Osama Basnan ........................................................... | | | 46 |
|     |     | 4. | Saleh Al Hussayen ..................................................... | | | 46 |
|     |     | 5. | Mohammed Al Qudhaieen and Hamdan Al Shalawi .................... | | | 47 |
|     |     | 6. | Mohammed Jabar Fakihi ............................................ | | | 47 |
|     |     | 7. | Omar Abdi Mohamed ................................................ | | | 47 |
| III. | Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Charity ............................................................ | | | | | 48 |
|     | A. | The Consolidated Amended Complaint .......................... | | | | 48 |
|     |     | 1. | The Charities Are Not Alter Egos of Saudi Arabia ................. | | | 49 |
|     |     |     |     | a. | The SHC ................................................................... | 52 |
|     |     |     |     | b. | The SJRC .................................................................. | 54 |

| | | c. | The Red Crescent ........................................................54 |
| | | d. | The MWL.....................................................................54 |
| | | e. | The IIRO ......................................................................55 |
| | | f. | WAMY ..........................................................................56 |
| | | g. | Al Haramain ................................................................57 |
| | | h. | Other Entities .............................................................58 |
| | 2. | The Charities Are Not Agents of Saudi Arabia ............................58 |
| | 3. | The Charities Are Not an Integral Part of the Government of Saudi Arabia .........................................................59 |
| | 4. | Plaintiffs Can Neither Plead nor Prove Any Tortious Act by Unnamed Officials or the Ministry of Islamic Affairs ..........................................................................60 |
| | | a. | Unnamed Officials ......................................................60 |
| | | b. | The Ministry of Islamic Affairs ................................61 |
| | | c. | Umm Al Qura ..............................................................62 |
| | | d. | Moussaoui ....................................................................62 |
| | 5. | No Act of Any of the Charities Caused the 9/11 Attacks .............................................................................................63 |
| | B. | The *Ashton* Complaint .........................................................................64 |
| IV. | Jurisdictional Discovery Is Not Warranted........................................................67 |
| | A. | This Court's Previous Denial of Jurisdictional Discovery Was Correct ........................................................................................67 |
| | B. | Jurisdictional Discovery Should Again Be Denied ................................68 |
| V. | Constitutional Limits on Congress's Power Provide Additional Reasons To Dismiss...................................................................................70 |
| | A. | If JASTA Were Read To Dictate That Plaintiffs Prevail, It Would Be Unconstitutional Under Article III ...........................................70 |

B. JASTA Is Unconstitutional as Applied to Plaintiffs Who Were Bound by This Court's Previously Final Judgment as of 2009 ........................................................................................................71

    1. Only the Judicial Branch May Reopen the Final Judgment of an Article III Court..........................................71

    2. The Second Circuit's 2013 Decision To Reopen This Court's Final Judgment Was an Exercise of Article III Power ..............................................................72

    3. Congress's Decision To Apply a New, Different Rule to This Case Violates the Separation of Powers...................73

C. JASTA Violates Due Process ....................................................74

CONCLUSION....................................................................................................75

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp. 2d 841
  (S.D. Ohio 2003)........................................................................................38

*American Biomaterials Corp., In re*, 954 F.2d 919 (3d Cir. 1992) .............................................12

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)........................................................16

*Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2d Cir. 2016)...............49, 50, 51, 52,
  58, 65, 67, 68, 69

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ...............................10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................7, 18, 25, 27, 34, 43, 61

*Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288 (1936)........................................................70

*Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715(TPG),
  2009 WL 755231 (S.D.N.Y. Mar. 12, 2009), *rev'd*, 584 F.3d 120 (2d Cir.
  2009) ........................................................................................60

*Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78 (2d Cir. 1993)........................................71

*Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) ...............................................................71, 73

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002)........................................................17

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................................37

*Best, In re*, 95 A.D.3d 1536 (N.Y. App. Div. 2012)........................................................34

*Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012)........................................................11, 13

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017)........................................................................................19, 20

*Brink's Ltd. v. South African Airways*, 93 F.3d 1022 (2d Cir. 1996) ...........................................12

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)...............................................................11

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9 (D.D.C. 2003) .....................17, 44, 64

*Burrage v. United States*, 134 S. Ct. 881 (2014) ...............................................................14, 15

*County of Suffolk v. First Am. Real Estate Sols.*, 261 F.3d 179 (2d Cir. 2001)............................75

*Dahabshiil Transfer Servs. Ltd. v. Barclays Bank Plc*, [2013] EWHC 3379 (Ch),
 2013 WL 5826347 ............................................................................................43

*DDAVP Direct Purchaser Antitrust Litig.*, *In re*, 585 F.3d 677 (2d Cir. 2009) ...........................41

*Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85 (2d Cir. 2013).....................................................45

*Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011).................................................................7, 8, 71, 73

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) .........................................................................58

*Duane Thomas LLC v. Wallin*, 8 A.D.3d 193 (N.Y. App. Div. 2004).........................................12

*EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78 (2d Cir. 2015),
 *cert. dismissed*, 136 S. Ct. 1731 (2016) ........................................................49, 50, 51, 52,
 55, 56, 57, 58, 59, 65

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ...........................................67, 69

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) .................................................................11

*Federal Ins. Co. v. Kingdom of Saudi Arabia*, 557 U.S. 935 (2009)...............................................7

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611
 (1983)................................................................................................................2, 49, 50, 51,
 56, 58, 59, 60, 68

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
 582 F.3d 393 (2d Cir. 2009)............................................................................................75

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) .....................................................59, 60

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).................................................................14, 15

*Grosshandels-Und Lagerei-Berufsgenossenschaft v. World Trade Ctr. Props., LLC*,
 435 F.3d 136 (2d Cir. 2006)............................................................................................13

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................................41

*Holmes v. Securities Inv'r Prot. Corp.*, 503 U.S. 258 (1992)..................................................15, 16

*Hussein v. Dahabshiil Transfer Servs. Ltd.*, No. 15-CV-9623 (VEC),
 2017 WL 395210 (S.D.N.Y. Jan. 27, 2017) .................................................................43

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).....................15

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)............................................................................13

*Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir. 1986)...............................................19

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123
(D.C. Cir. 2004) ..................................................................................15

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006)...........................................13

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016),
*cert. denied*, 137 S. Ct. 1332 (2017)................................51, 58, 65

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991)...................71, 72

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ........................................23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160
(2d Cir. 2015) ......................................................................................15

*Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966 (2d Cir. 1985) ............................74

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ...............................................53

*Milner v. Department of Navy*, 562 U.S. 562 (2011)............................................................18

*N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844 (N.Y. 2002) ..............................................12, 32

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ...............................................................17

*NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ. 7013(TPG),
2011 WL 524433 (S.D.N.Y. Feb. 15, 2011)................................51, 55, 65

*Owens v. Republic of Sudan*, 531 F.3d 884 (D.C. Cir. 2008) .......................................15

*Platinum & Palladium Commodities Litig., In re*, 828 F. Supp. 2d 588
(S.D.N.Y. 2011) ................................................................................23

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)....................................71, 72, 73, 74

*Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F. Supp. 124
(S.D.N.Y. 1996) ................................................................................13

*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979)...............................................................11

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992) ...........................................71

*Robinson v. Government of Malaysia*, 269 F.3d 133 (2d Cir. 2001)................................18, 19, 64

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ................................15, 16, 17, 31, 64

*Rymanowski v. Pan Am. World Airways, Inc.*, 70 A.D.2d 738 (N.Y. App. Div.
1979), *aff'd*, 404 N.E.2d 1336 (N.Y. 1980) ......................................................12

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)................................................14, 15

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)........................................................10

*Scribner v. Summers*, 84 F.3d 554 (2d Cir. 1996) ...................................................13

*September 11 Litig., In re*, 621 F. Supp. 2d 131 (S.D.N.Y. 2009) .................................20, 21, 23

*Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22 (2d Cir. 2011)..................................60

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..........................53

*Stuto v. Fleishman*, 164 F.3d 820 (2d Cir. 1999).....................................................13

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ...................................................11, 12

*Terrorist Attacks on September 11, 2001, In re*:

    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*"), *on recon.
in part*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir.
2008), *cert. denied*, 557 U.S. 935 (2009)................................................6, 19

    392 F. Supp. 2d 539 (S.D.N.Y. 2005) ("*Terrorist Attacks II*"), *aff'd*,
538 F.3d 71 (2d Cir. 2008), *cert. denied*, 557 U.S. 935 (2009)..........................6

    538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*"), *cert. denied*,
557 U.S. 935 (2009)...................................................................6, 7, 67

    718 F. Supp. 2d 456 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*"), *aff'd*,
714 F.3d 109 (2d Cir. 2013)..............................................................17

    740 F. Supp. 2d 494 (S.D.N.Y. 2010) ("*Terrorist Attacks V*"), *aff'd*,
714 F.3d 118 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2870 (2014).....................12

    714 F.3d 118 (2d Cir. 2013) ("*Terrorist Attacks VI*"), *cert. denied*,
134 S. Ct. 2870 (2014).......................................................13, 15, 16, 17, 64

    714 F.3d 659 (2d Cir. 2013) ("*Terrorist Attacks VII*"), *cert. denied*,
134 S. Ct. 2870 (2014)...................................................................75

    741 F.3d 353 (2d Cir. 2013) ("*Terrorist Attacks VIII*"), *cert. denied*,
134 S. Ct. 2875 (2014)............................................................8, 43, 71, 72, 73

    134 F. Supp. 3d 774 (S.D.N.Y. 2015) ("*Terrorist Attacks IX*"), *vacated
and remanded*, No. 15-3426-cv(L), ECF No. 287 (2d Cir. Feb. 7, 2017) ..........8, 9, 10, 18,
24, 26, 32, 33, 34,
35, 50, 53, 62, 63, 66, 67

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300
 (2d Cir. 1981).................................................................................................75

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) .......................................11

*Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843
 (D.C. Cir. 2000) .......................................................................................51-52

*United States v. Amawi*, 541 F. Supp. 2d 945 (N.D. Ohio 2008), *aff'd*,
 695 F.3d 457 (6th Cir. 2012) ......................................................................53

*United States v. International Bhd. of Teamsters*, 141 F.3d 405 (2d Cir. 1998) ...................12, 40

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ......................................53

*United States v. Mohamed*, 203 F. App'x 879 (9th Cir. 2006) ........................43

*University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013)....................14, 15

*Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230 (2d Cir. 2002) ........................18

*Weiss v. National Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) ......................................12

*Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247
 (2d Cir. 2000)....................................................................................19, 49, 50

*Zeak v. United States*, No. 11 Civ. 4253(KPF), 2015 WL 246340
 (S.D.N.Y. Jan. 20, 2015)............................................................................13

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const.:

 Art. I....................................................................................................72

  § 9, cl. 3 (*Ex Post Facto* Clause) ........................................................74

 Art. III...................................................................................70, 71, 72, 74

Alien Tort Claims Act, 28 U.S.C. § 1350................................................................13

Antiterrorism Act, Pub. L. No. 102-572, tit. X, § 1003, 106 Stat. 4506, 4521
 (1992).............................................................................9, 12, 15, 16, 17, 31, 74

Extension of Admiralty Jurisdiction Act, ch. 526, 62 Stat. 496 (1948)........................................15

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
(codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) ................................. *passim*

    28 U.S.C. § 1330(c) .................................................................................................74

    28 U.S.C. § 1603(b)(1) ............................................................................................60

    28 U.S.C. § 1603(b)(2) ............................................................................................60

    28 U.S.C. § 1605(a)(3).......................................................................................19, 59

    28 U.S.C. § 1605(a)(5)..........................................................................6, 9, 11, 73

    28 U.S.C. § 1605(a)(5)(A) ......................................................................................10

    28 U.S.C. § 1605(a)(7).............................................................................................15

    28 U.S.C. § 1605A ...........................................................................................7, 9, 15

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
(2016) (codified at, *inter alia*, 28 U.S.C. § 1605B)................................................ *passim*

    § 2(a)(7), 130 Stat. 852-53 .....................................................................................14

    § 3(a), 130 Stat. 853......................................................................................... 30-31

    28 U.S.C. § 1605B ....................................................................................................14

    28 U.S.C. § 1605B(b) ......................................................................................9, 11, 14

    28 U.S.C. § 1605B(b)(2)....................................................................................11, 12, 59

    28 U.S.C. § 1605B(c)..................................................................................................9

    28 U.S.C. § 1605B(d)..........................................................................................11, 14

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ............ 12-13, 16

18 U.S.C. § 2339B .................................................................................................................41

26 U.S.C. § 501(c)(3).............................................................................................................47

Fed. R. Civ. P.:

    Rule 12(b)(6)........................................................................................................18

    Rule 60(b) ........................................................................................................8, 72

Fed. R. Evid.:

    Rule 702 ..................................................................................................23

    Rule 803(8) ........................................................................................22, 23

    Rule 803(8)(A)(iii)............................................................................20, 22

    Rule 803(8)(B) .........................................................................................20

**LEGISLATIVE MATERIALS**

162 Cong. Rec.:

    p. S2845 (daily ed. May 17, 2016)..................................................18

    p. S5927 (daily ed. Sept. 21, 2016)................................................70

    p. H6025 (daily ed. Sept. 28, 2016) ...............................................70

**OTHER MATERIALS**

9/11 Review Commission, *The FBI:  Protecting the Homeland in the 21st
    Century* (Mar. 2015), https://www.fbi.gov/news/pressrel/press-releases/
    the-fbi-releases-final-report-of-the-9-11-review-commission ....................6, 20, 28, 30, 32

Al Arabiya, *How Will Saudi Arabia Distribute Its Financial Support to Its
    Citizens*? (Dec. 22, 2016), http://english.alarabiya.net/en/business/
    economy/2016/12/22/Monthly-financial-support-announced-for-Saudi-
    citizens.html ...............................................................................................34

Br. for the United States as Amicus Curiae, *Federal Ins. Co. v. Kingdom of Saudi
    Arabia*, No. 08-640 (U.S. filed May 29, 2009), 2009 WL 1539068,
    https://www.justice.gov/sites/default/files/osg/briefs/2008/01/01/2008-
    0640.pet.ami.inv.pdf ..........................................................................7, 26, 50

Dan Christensen & Anthony Summers, BrowardBulldog.org, *Graham:  FBI
    report raises questions about who helped 9/11 terrorists*, Miami Herald
    (FL), Apr. 18, 2013, 2013 WLNR 9467587 .......................................30

Enclosure to Letter from Robert S. Mueller, Director, FBI, and Porter J. Goss,
    Director, CIA, to Sen. Pat Roberts, Chairman, Select Committee on
    Intelligence, United States Senate (Sept. 1, 2005), https://www.dni.gov/
    files/documents/Newsroom/Executive_Summary_of_Joint_FBI-CIA_
    Report_on_Extent_of_Saudi_Government_Support_for_Terrorism.pdf ............. 5, 20, 26,
    28, 37, 63

First Am. Compl., *Federal Ins. Co. v. al Qaida*, No. 03-cv-6978, ECF No. 772
    (S.D.N.Y. filed Sept. 30, 2005) ..................................................................................... 3, 60

Michael Isikoff, *Terror Watch:  The Saudi-Al Qaeda Connection*, Newsweek,
    Sept. 9, 2003, http://www.newsweek.com/terror-watch-saudi-al-qaeda-
    connection-136275 ........................................................................................................ 62

Joint Mot. To Vacate and Remand, *In re Terrorist Attacks on September 11, 2001*,
    No. 15-3426-cv(L), ECF No. 255-1 (2d Cir. filed Oct. 21, 2016) ....................................... 9

Matthew Levitt, *Subversion from Within:  Saudi Funding of Islamic Extremist
    Groups Undermining U.S. Interests and the War on Terror from within the
    United States* (Sept. 10, 2003), http://www.washingtoninstitute.org/policy-
    analysis/pdf/subversion-from-within-saudi-funding-of-islamic-extremist-
    groups-underminin ........................................................................................................ 41

National Commission on Terrorist Attacks Upon the United States:

    Outline of the 9/11 Plot, Staff Statement No. 16 (June 16, 2004), https://
    www.9-11commission.gov/staff_statements/staff_statement_16.pdf .................... 5, 21, 29

    *The 9/11 Commission Report:  Final Report of the National Commission
    on Terrorist Attacks Upon the United States* (July 2004), https://www.
    9-11commission.gov/report/911Report.pdf .................................................. 3, 4, 5, 20, 21,
    22, 26, 28, 29, 30,
    31, 32, 33, 37, 38, 45, 46

Order, *In re Terrorist Attacks on September 11, 2001*, No. 15-3426-cv(L),
    ECF No. 287 (2d Cir. Feb. 7, 2017) ................................................................................. 10

Reply Br. for Plaintiffs-Appellants, *In re Terrorist Attacks on September 11, 2001*,
    No. 15-3426-cv(L), ECF No. 248 (2d Cir. filed July 25, 2016) ........................................ 20

Restatement (Third) of Agency (2006) ................................................................................. 12

John Roth et al., National Commission on Terrorist Attacks Upon the United
    States, *Monograph on Terrorist Financing:  Staff Report to the
    Commission* (2004), https://www.9-11commission.gov/staff_statements/
    911_TerrFin_Monograph.pdf ...................................................................... 4, 21, 31, 57

Saudi Arabian Cultural Mission, *About SACM*, http://www.sacm.org/AboutSACM.aspx .......... 34

Statement by the Office of the Director of National Intelligence on the
    Declassification of Part Four of the Senate Select Committee on
    Intelligence and House Permanent Select Committee on Intelligence's
    2002 Report on the Committees' Joint Inquiry into Intelligence Community
    Activities Before and After the Terrorist Attacks of September 11, 2001
    (July 15, 2016), https://www.dni.gov/index.php/newsroom/congressional-
    testimonies/congressional-testimonies-2016/item/1612-statement-by-the-
    odni-on-the-declassification-of-part-four-of-the-ssci-and-hpsci-s-2002-
    report-on-the-committees-joint-inquiry-into-intelligence-community-
    activities-before-and-after-the-terrorist-attacks-of-september-11-2001 ..........................22

*The Oxford Dictionary of Islam* (John L. Esposito ed., 2003).......................................................48

*United States v. Moussaoui*, No. 1:01-cr-455 (E.D. Va.):

    Addendum to Evaluation of Adjudicative Competence, attached as Exh. C
    to Standby Counsel's Memorandum Regarding Rule 11 Considerations,
    ECF No. 356 (filed July 24, 2002).......................................................................63

    Aff. of Zacarias Moussaoui, attached to Def.'s Mot. To Withdraw Guilty
    Plea, ECF No. 1857 (filed May 8, 2006) ............................................................63

    Trial Tr., ECF No. 1755 (Mar. 27, 2006) ..........................................................63

*Webster's Third New International Dictionary* (2002) ..................................................................42

## INTRODUCTION

These cases are again before this Court to determine whether Plaintiffs can establish

jurisdiction over the Kingdom of Saudi Arabia ("Saudi Arabia") and its instrumentality the Saudi

High Commission ("SHC") under the Foreign Sovereign Immunities Act of 1976 ("FSIA").[1]

Since 2003, Plaintiffs have pursued baseless accusations that Saudi Arabia conspired to commit a

horrific crime against its longstanding ally the United States by knowingly funding the terrorist

attacks of September 11, 2001 (the "9/11 attacks").  No court and no agency has ever found

Plaintiffs' allegations legally sufficient or supported by evidence.  The suggestion that Saudi

Arabia aided the 9/11 plot was rejected by the 9/11 Commission in 2004, by the FBI and the CIA

in 2005, and by a second independent commission in 2015.  Yet, through one extraordinary

procedural turn after another, this case has dragged on for 14 years as those claims have

repeatedly been dismissed and then, for reasons unrelated to their merits, brought back.

Since this Court's last ruling in 2015, Congress has passed a statutory amendment – the

Justice Against Sponsors of Terrorism Act ("JASTA")[2] – that eliminates some of Saudi Arabia's

defenses.  Under JASTA, Saudi Arabia can no longer assert the entire-tort rule or the

discretionary-function exception in support of immunity.  But JASTA retains three core

requirements:  Plaintiffs must still properly allege and present admissible evidence of (1) an act

by an official, employee, or agent of Saudi Arabia, acting within the scope of office,

employment, or agency, (2) that was a tort, and (3) that caused the 9/11 attacks.

Plaintiffs cannot meet that burden.  The most recent versions of their complaints refer to a

few new documents – most notably, the now-declassified "28 pages" from a congressional

---

[1] Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611).

[2] Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at, *inter alia*, 28 U.S.C. § 1605B).

inquiry in 2002.  But the 28 pages and Plaintiffs' other new materials – like the thousands of pages they unsuccessfully presented before – are hearsay and speculation, insufficient to support the findings required for jurisdiction over Saudi Arabia.  Thus, although the analysis required by JASTA has narrowed, it comes to the same place in the end.  Neither proper allegations nor any evidence support Plaintiffs' conclusory assertions that Saudi Arabia caused the 9/11 attacks by knowingly or even recklessly aiding the terrorists who committed them.

JASTA does nothing to repair the insufficiency of Plaintiffs' recycled allegations based on the purported conduct of individuals who Plaintiffs assert were acting on behalf of Saudi Arabia, such as Omar Al Bayoumi and Fahad Al Thumairy.  This Court found those allegations insufficient for reasons that JASTA has not changed and Plaintiffs have failed to remedy.  Some new names appear in the complaints, but the allegations attached to those names are just as conclusory and just as unsupported as Plaintiffs' previous attempts.  Similarly, JASTA does not change the alter-ego standard (under the well-established *Bancec* line of cases) that this Court previously applied to reject Plaintiffs' contention that Saudi Arabia can be subjected to U.S. jurisdiction based on accusations against charities that are juridically separate entities.

There is thus no basis on which this Court could find – as the FSIA requires even after JASTA – that Plaintiffs have come forward with sufficient evidence to establish an exception to foreign sovereign immunity.  Nor should this Court permit Plaintiffs to undertake jurisdictional discovery as a last-ditch effort to identify facts to support their claims.  Well before the present remand, Plaintiffs waived such discovery by repeated failures to request it appropriately.  They have recently served an extraordinarily broad set of document requests, but those requests are fatally inconsistent with the FSIA's mandate for limited jurisdictional discovery only after Plaintiffs have made a prima facie case (which they have not done) and then only to verify

allegations of specific, crucial facts.  The Court should thus again grant Saudi Arabia's motion to dismiss after concluding that Plaintiffs have not met their burden and exercising its discretion to deny jurisdictional discovery.

## BACKGROUND

Plaintiffs are insurance companies, businesses, family members, and personal injury claimants who suffered damages from the terrorist attacks of September 11, 2001.  Beginning in 2003, they have leveled indiscriminate, boilerplate accusations that hundreds of nongovernmental and governmental defendants knowingly and intentionally conspired with and aided the terrorist criminals and criminal organizations who perpetrated the attacks.  *See*, *e.g.*, First Am. Compl., *Federal Ins. Co. v. al Qaida*, No. 03-cv-6978, ECF No. 772 (S.D.N.Y. filed Sept. 30, 2005) ("*Fed. Ins.* Compl.").  Fourteen years after this case began, many of Plaintiffs' claims have been dismissed, some are in discovery, and a few have led to default judgments. None has been proved.  The present motion addresses Plaintiffs' renewed claims against Saudi Arabia.  The SHC, Saudi Arabia's instrumentality, is moving separately to dismiss.

### A.    The 9/11 Commission and Later Investigations

After the 9/11 attacks, Congress established the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission") and directed it to determine who was responsible for those attacks and to recommend measures that would protect the United States in the future.  That Commission produced its Final Report (the "9/11 Report," Ex. 1)[3] in 2004.  The 9/11 Report reflects the review of more than 2.5 million pages of documents, interviews of more than 1,200 individuals in 10 countries, 19 days of public hearings, and public testimony from 160 witnesses.  9/11 Report xv.  Its conclusions were unanimous.

---

[3] Exhibits to this memorandum are attached to the declaration of counsel filed at the same time as and in support of Saudi Arabia's motion.

The 9/11 Commission investigated the topic of terrorist financing, including the financing for the 9/11 attacks.  It considered and rejected allegations that the government of Saudi Arabia had provided financing for Al Qaeda:  "[W]e have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization."  *Id.* at 171.  The Commission noted, however, that some charities that received "significant Saudi government sponsorship" might have "diverted funds to al Qaeda."  *Id.*  As to the 9/11 plot specifically, the Commission was more categorical:  "[W]e have seen no evidence that any foreign government – or foreign government official – supplied any funding."  *Id.* at 172.[4]

The Commission also investigated the activities of the 9/11 hijackers, including allegations that certain individuals had knowingly assisted them in preparing for the attacks.  As relevant to this motion, the Commission considered evidence concerning Omar Al Bayoumi, Fahad Al Thumairy, and Osama Basnan.  As to Al Thumairy and Basnan, the Commission found no evidence that either man had done anything to assist the hijackers.[5]  As to Al Bayoumi, the Commission found that he had lunch with two of the hijackers and later helped them find an apartment in San Diego, but found "no credible evidence that he believed in violent extremism or

---

[4] The Commission's staff also published a study documenting its investigation and analysis.  *See* John Roth et al., National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing:  Staff Report to the Commission* (2004) ("Terrorist Financing Monograph"), Ex. 2; *see also id.* at 13 ("There is no evidence that any person in the United States, or any foreign government, provided any substantial funding to the hijackers."); *id.* at 24 ("While there have been numerous allegations about Saudi government complicity in al Qaeda, the Commission staff has found no persuasive evidence that the Saudi government as an institution or as individual senior officials knowingly support or supported al Qaeda."); *id.* at 140 (finding "no evidence that any government funded the 9/11 plot in whole or part").

[5] *See* 9/11 Report 217 ("[A]fter exploring the available leads, we have not found evidence that Thumairy provided assistance to the [hijackers]."); *id.* at 515 n.14 (describing relevant records searches, interviews, and cooperation with other government agencies); *id.* at 516 n.24 ("Contrary to highly publicized allegations, we have found no evidence that [the hijackers] received money from another Saudi citizen, Osama Bassnan.").

knowingly aided extremist groups." *Id.* at 218.  That finding reflected the work of "investigators who ha[d] dealt directly with [Al Bayoumi] and studied his background" and "f[ou]nd him to be an unlikely candidate for clandestine involvement with Islamist extremists." *Id.*  The Commission also found that Al Bayoumi had never "give[n] money" to the two men.  *Id.* at 219.[6]

A 2005 report to Congress by the FBI and the CIA similarly found no evidence to support allegations that Saudi Arabia knowingly supported the 9/11 attacks.[7]  Although the report itself remains classified, an executive summary that was declassified in 2016 sets forth its findings, including findings of (1) "no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001 or . . . had foreknowledge of terrorist operations in the Kingdom or elsewhere," and (2) "no information to indicate that either Omar al-Bayoumi or Osama Basnan materially supported the hijackers wittingly, were intelligence officers of the Saudi Government or provided material support for the 11 September attacks, contrary to media speculation."  2005 FBI-CIA Summary 2.[8]

In 2013 and 2014, Congress created a new independent commission (the "9/11 Review Commission") to follow up on the FBI's implementation of recommendations from the original 9/11 Commission and to review any new evidence "related to any factors that contributed in any

---

[6] The Commission considered evidence that Al Bayoumi gave the hijackers funds for a deposit on an apartment, but found that they "reimbursed [Al Bayoumi] on the spot."  9/11 Report 219.  The Commission's investigation is further documented in a public statement by its staff.  *See* National Commission on Terrorist Attacks Upon the United States, Outline of the 9/11 Plot, Staff Statement No. 16, at 5, 12 (June 16, 2004) ("Staff Statement No. 16"), Ex. 3.

[7] *See* Enclosure to Letter from Robert S. Mueller, Director, FBI, and Porter J. Goss, Director, CIA, to Sen. Pat Roberts, Chairman, Select Committee on Intelligence, U.S. Senate (Sept. 1, 2005) ("2005 FBI-CIA Summary"), Ex. 4.

[8] The FBI and the CIA found "evidence that official Saudi entities . . . and associated nongovernmental organizations" had "provide[d] financial and logistical support to individuals . . . associated with terrorism-related activity," 2005 FBI-CIA Summary 2, but not that any such support was provided knowingly or that it contributed to the 9/11 attacks.

manner to the terrorist attacks of September 11, 2001."[9]  In its March 2015 report, the 9/11

Review Commission found "no new information to date that would alter the original findings of

the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting

those responsible for the attacks."  9/11 Review Report 101.[10]  In so finding, the 9/11 Review

Commission specifically considered Al Bayoumi and Al Thumairy.  *See id.* at 101-03.

## B.      History of These Cases

### 1.       Judge Casey's Rulings and Related Appeals

In 2005 and 2006, Judge Casey granted Saudi Arabia's and the SHC's motions to dismiss

for lack of jurisdiction under the FSIA.[11]  Plaintiffs then relied mainly on the FSIA's non-

commercial-tort exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(5), but their

"allegations c[ould ]not overcome the discretionary function exception to the tortious acts

exception."  *Terrorist Attacks I*, 349 F. Supp. 2d at 803 (Saudi Arabia); *see Terrorist Attacks II*,

392 F. Supp. 2d at 555 (same for SHC).  The Court entered partial final judgments in favor of

Saudi Arabia and the SHC.  ECF Nos. 1554, 1594.

The Second Circuit affirmed on alternative grounds.  *See In re Terrorist Attacks on*

*September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*").  The court of appeals

held that tort claims based on alleged support for terrorism could be brought only under the

---

[9] 9/11 Review Commission, *The FBI:  Protecting the Homeland in the 21st Century* 3
(Mar. 2015) ("9/11 Review Report") (emphasis omitted), Ex. 5.

[10] *See* 9/11 Review Report 101-03 (new information "not sufficient to change the 9/11
Commission's original findings regarding the presence of witting assistance to" the hijackers);
*see also id.* at 107, 117 (similar).

[11] *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y.
2005) ("*Terrorist Attacks I*"); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d
539 (S.D.N.Y. 2005) ("*Terrorist Attacks II*"); *see also* ECF No. 883.  Subsequent history is
omitted for the *Terrorist Attacks* cases because it would render citations unwieldy.  The relevant
history is familiar to the Court and discussed throughout this memorandum.

FSIA's exception for designated state sponsors of terrorism, 28 U.S.C. § 1605A.  538 F.3d at 86-90.  Saudi Arabia cannot be sued under § 1605A because it has never been so designated.  *Id.* at 89.  The appellate court declined to reach the discretionary-function ground for Judge Casey's ruling or any other bases for defending the judgment.

Plaintiffs sought certiorari, and the Supreme Court called for the views of the Solicitor General.  She recommended that the Court deny the petition.[12]  She disagreed with the Second Circuit's interpretation of § 1605A as exclusive, but argued that "Saudi Arabia and its officials are immune from suit for governmental acts outside the United States," U.S. Amicus Br. 3 – a principle often called the "entire-tort rule" – and that Plaintiffs had not properly "allege[d] that Saudi Arabia, its officials, or employees, committed tortious acts within the United States," *id.* at 12.[13]  The Supreme Court denied the petition.  *Federal Ins. Co. v. Kingdom of Saudi Arabia*, 557 U.S. 935 (2009).  Judge Casey's judgments were accordingly no longer subject to review.

## 2.   *Doe v. Bin Laden* **and the Reopening of These Cases**

In 2011, the Second Circuit revisited the question whether the FSIA's non-commercial-tort exception can ever provide jurisdiction over claims alleging support for terrorism.  *See Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011) (per curiam).  Partially overruling *Terrorist Attacks III*, the Second Circuit held that "the terrorism exception, rather than limiting the jurisdiction conferred by the noncommercial tort exception, provides an additional basis for jurisdiction."  *Id.* at 70 & n.10.  *Doe*, which involved claims against the former Taliban government of Afghanistan, was remanded to this Court.  Nothing substantive has since happened in that docket.

---

[12] *See* Br. for the United States as Amicus Curiae, *Federal Ins. Co. v. Kingdom of Saudi Arabia*, No. 08-640 (U.S. filed May 29, 2009), 2009 WL 1539068 ("U.S. Amicus Br."), https://www.justice.gov/sites/default/files/osg/briefs/2008/01/01/2008-0640.pet.ami.inv.pdf.

[13] In so arguing, the Solicitor General noted that Plaintiffs' conclusory allegations about Al Bayoumi did not satisfy *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  U.S. Amicus Br. 16 n.4.

Shortly after *Doe*, Plaintiffs moved under Rule 60(b) for relief from the final judgments in favor of Saudi Arabia and the SHC.  This Court denied that motion, ECF No. 2578, but the Second Circuit reversed.  *See In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353 (2d Cir. 2013) ("*Terrorist Attacks VIII*").  The appellate court concluded that *Doe* warranted reopening Judge Casey's final judgments to remove "a disparity between the *Terrorist Attacks* plaintiffs and the [*Doe*] plaintiff where none should ever have existed."  *Id.* at 359.

### 3.    Proceedings After the 2013 Remand and This Court's 2015 Ruling

On remand, Saudi Arabia and the SHC again moved to dismiss, contending that (1) Plaintiffs failed to allege plausibly or come forward with evidence that any official or employee of Saudi Arabia or the SHC committed a tortious act or omission within the United States; (2) Saudi Arabia's policy of funding Islamic charities is a discretionary function; and (3) Plaintiffs failed to allege plausibly or to come forward with evidence that Saudi Arabia caused the attacks of September 11.  ECF No. 2894.  Plaintiffs responded in part with a 587-paragraph Averment of Facts ("Averment") and 273 ostensibly supporting documents.  ECF Nos. 2927, 2930.[14]  Plaintiffs also sought leave to file a Consolidated Amended Pleading of Facts and Evidence that was substantively identical to the Averment.  ECF Nos. 2891, 2892.

This Court granted the motion to dismiss.  It concluded that "[t]he allegations in the Complaint alone do not provide this Court with a basis to assert jurisdiction over Defendants" and that "[f]iling the Averment of Facts [would be] futile, . . . because the additional allegations do not strip Defendants of sovereign immunity."  *In re Terrorist Attacks on September 11, 2001*, 134 F. Supp. 3d 774, 782 (S.D.N.Y. 2015) ("*Terrorist Attacks IX*").  The Court relied in part on

---

[14] Saudi Arabia vigorously disputed whether (a) Plaintiffs' voluminous documents supported their factual allegations and (b) more than a handful of those documents were admissible evidence (or evidence in any sense of the word at all).  ECF Nos. 2928, 2948, 2948-1.

the entire-tort rule, *see id.* at 781; it also rejected as insufficient Plaintiffs' contentions that

certain Saudi Arabian individuals (including Al Bayoumi and Al Thumairy) aided the 9/11

hijackers, *see id.* at 785-87, and that certain charities that had purportedly funded Al Qaeda were

"alter egos" of Saudi Arabia, *see id.* at 783-84.  Plaintiffs appealed.

**C.      JASTA and the Present Remand**

On September 28, 2016, before argument in the Second Circuit, Congress overrode

President Obama's veto to enact JASTA.  JASTA creates a new FSIA exception for

> any case in which money damages are sought against a foreign state for physical
> injury to person or property or death occurring in the United States and caused
> by—
>
> (1) an act of international terrorism in the United States; and
>
> (2) a tortious act or acts of the foreign state, or of any official, employee,
> or agent of that foreign state while acting within the scope of his or her office,
> employment, or agency, regardless where the tortious act or acts of the foreign
> state occurred.

28 U.S.C. § 1605B(b).  Thus, unlike the non-commercial-tort exception, *id.* § 1605(a)(5), JASTA

does not incorporate an entire-tort rule or a discretionary-function exception; unlike the previous

terrorism exception, *id.* § 1605A, JASTA does not require that a defendant be designated as a

state sponsor of terrorism by the Executive Branch.  JASTA also permits for the first time claims

against foreign sovereigns under the Antiterrorism Act ("ATA").  *See id.* § 1605B(c).

Acknowledging that "JASTA was intended to apply to this case," all parties asked the

Second Circuit to vacate and remand.  Joint Mot. To Vacate and Remand at 2, *In re Terrorist

Attacks on September 11, 2001*, No. 15-3426-cv(L), ECF No. 255-1 (2d Cir. filed Oct. 21, 2016).

Saudi Arabia and the SHC expressly reserved "any available arguments concerning JASTA,

including but not limited to constitutional challenges" as well as "any other arguments for

dismissal that are not foreclosed by JASTA."  *Id.* at 2 n.1.  The court of appeals granted the

motion, leaving all such arguments to this Court "in the first instance."  Order, *In re Terrorist Attacks on September 11, 2001*, No. 15-3426-cv(L), ECF No. 287 (2d Cir. Feb. 7, 2017).

Plaintiffs filed their present Consolidated Amended Complaint ("CAC") on March 17, 2017, with some joining through later-filed Notices To Conform or Short Form Complaints. Others (the "*Ashton* Plaintiffs") filed a separate complaint against Saudi Arabia on March 20. Consol. Compl., *Ashton v. Kingdom of Saudi Arabia*, No. 1:17-cv-02003-GBD-SN, ECF No. 1 (the "*Ashton* Complaint").[15]

## ARGUMENT

### I.   Plaintiffs Must Allege and Come Forward with Evidence of a Tortious Act Within the Scope of Office, Employment, or Agency That Caused the 9/11 Attacks

The core principles of foreign sovereign immunity are unchanged from the last time this case was before this Court.  The FSIA remains the "sole basis for obtaining jurisdiction over a foreign state in our courts," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989), and makes Saudi Arabia "presumptively immune from the jurisdiction of United States courts[] unless a specified exception applies," *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  This Court previously ruled in *Terrorist Attacks IX* that Plaintiffs failed to bring their case against Saudi Arabia and the SHC within the FSIA's non-commercial-tort exception.

Unlike the non-commercial-tort exception, JASTA does not require an entire tort within the United States and does not exclude claims "based upon the exercise or performance . . . [of] a discretionary function."  28 U.S.C. § 1605(a)(5)(A).  But JASTA still imposes three requirements that Plaintiffs must meet:  (1) an act by an official, employee, or agent of Saudi Arabia, acting within the scope of office, employment, or agency, (2) that was a tort, and (3) that

---

[15] This motion applies both to the CAC and to the *Ashton* Complaint, as well as to the complaints in *Bowrosen*, No. 16-cv-8070; *DeSimone*, No. 17-cv-348; and *Lloyd's Syndicate 53*, No. 17-cv-2129, which are substantially identical to the CAC without formally incorporating it.

caused the 9/11 attacks.  *See id.* § 1605B(b).  It also excludes claims brought "on the basis of an omission or a tortious act or acts that constitute mere negligence." *Id.* § 1605B(d).

### A.  JASTA Requires an Act by an Official, Employee, or Agent Within the Scope of Office, Employment, or Agency

JASTA's plain language requires that a claim be based on an "act or acts of the foreign state, or of any official, employee, agent of that foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605B(b)(2).  That language is similar to the non-commercial-tort exception's requirement of an act "within the scope of . . . office or employment." *Id.* § 1605(a)(5).  It also contemplates jurisdiction based on the acts of an "agent."

In these actions arising out of the 9/11 attacks, the law of New York governs the scope of any employment or agency relationship.  *See Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010) (applying New York law as "the law of the state in which the locus of injury occurred" to determine whether an employee's acts could be imputed to an employer under the non-commercial-tort exception).  Under that law, an employee's "tortious acts are imputable to the employer if 'done while the servant was doing his master's work.' " *Id.* (quoting *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979)).  But "an employer 'is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business.' " *Id.* (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), *and Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

Similarly, "New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012).  A principal is not "liable for . . . outrageous conduct of an agent who was acting for personal motives unrelated

to the furtherance of [the principal's] business." *Duane Thomas LLC v. Wallin*, 8 A.D.3d 193,

194 (N.Y. App. Div. 2004) (citing *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002)).

That includes agents' unauthorized criminal acts, especially acts that "directly harm[]" the

principal. *United States v. International Bhd. of Teamsters*, 141 F.3d 405, 409 (2d Cir. 1998)

("'[I]n no jurisdiction that our research has uncovered does an employee who embezzles from

the corporation act in the scope of employment in doing so.'") (quoting *In re American*

*Biomaterials Corp.*, 954 F.2d 919, 924-25 (3d Cir. 1992)).[16]

## B.     JASTA Requires That the Official's, Employee's, or Agent's Act Be Tortious

The act or acts giving rise to jurisdiction under JASTA must be "tortious."  28 U.S.C.

§ 1605B(b)(2).  Whether Plaintiffs have properly alleged and come forward with evidence of a

"tortious" act is determined under the law that would (if jurisdiction were established) govern the

claim.  *Swarna*, 622 F.3d at 144.  Here, Plaintiffs' claims all require specific intent, knowledge,

or, at a bare minimum, deliberate indifference to render the alleged acts tortious.

*First*, Plaintiffs' federal-law claims under the ATA, CAC ¶¶ 317-346; *Ashton* Compl.

¶¶ 52-70, require knowledge or at least deliberate indifference.  "[S]ubstantial assistance" to a

terrorist organization is wrongful only if provided with "know[ledge]" of or "deliberate[]

indifferen[ce]" to the commission of "terrorist acts."  *In re Terrorist Attacks on September 11,*

*2001*, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010) ("*Terrorist Attacks V*"); *see also Weiss v.*

*National Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014).  Plaintiffs' Racketeer

---

[16] *See also Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1028 (2d Cir. 1996)
(citing *Rymanowski v. Pan Am. World Airways, Inc.*, 70 A.D.2d 738, 739 (N.Y. App. Div. 1979)
(an employee who commits theft is not acting within the scope of his employment), *aff'd*, 404
N.E.2d 1336 (N.Y. 1980)).  To be sure, a principal can authorize an agent to "commi[t] . . . a
crime or an intentional tort," and so incur liability; but, in general, a legal prohibition on
committing an act "should lead a reasonable agent to believe that the principal does not intend to
authorize the agent to do the act."  Restatement (Third) of Agency § 2.02 cmt. h (2006).

Influenced and Corrupt Organizations Act ("RICO") claim, CAC ¶¶ 397-409, alleges predicate acts of material support and so also requires knowledge of terrorist acts.[17]

*Second*, Plaintiffs assert state-law claims that seek to attribute the actions of the 9/11 hijackers to Saudi Arabia through secondary-liability theories of civil conspiracy or aiding and abetting.  CAC ¶¶ 366-377; *Ashton* Compl. ¶¶ 77-80.  Those also require knowledge and intent (if such causes of action even exist).  *See Bigio*, 675 F.3d at 172 (aiding and abetting under New York law requires "knowledge of" an underlying tort and "substantial assistance to advance [that tort's] commission"); *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy.").  Plaintiffs also assert negligent supervision and hiring claims, CAC ¶¶ 385-396; *Ashton* Compl. ¶¶ 81-84, but those claims require an underlying tort by an employee or agent (which, as set forth here, requires at least recklessness).  *See Zeak v. United States*, No. 11 Civ. 4253(KPF), 2015 WL 246340, at *3 (S.D.N.Y. Jan. 20, 2015).[18]

---

[17] Plaintiffs' material-support-of-terrorism claim under the Alien Tort Claims Act, CAC ¶¶ 357-362; *Ashton* Compl. ¶¶ 85-91, is not even cognizable.  *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013) ("*Terrorist Attacks VI*").  Their "international law" claim, CAC ¶¶ 418-424, also is not cognizable because "[t]he law of nations generally does not create private causes of action to remedy its violations."  *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995).

[18] Plaintiffs' other state-law tort claims, CAC ¶¶ 363-365, 378-384, 410-417; *Ashton* Compl. ¶¶ 71-84, all appear to require attributing the actions of the 9/11 hijackers to Saudi Arabia through secondary liability, and in any event require intent or recklessness.  *See Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F. Supp. 124, 133 (S.D.N.Y. 1996) (assault and battery); *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (intentional infliction of emotional distress); *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (trespass).  Plaintiffs' wrongful death and survival claims, CAC ¶¶ 347-356; *Ashton* Compl. ¶¶ 71-84, also cannot give rise to a "tortious act" because wrongful death and survival are loss-allocation rules, not standards of conduct.  *See Grosshandels-Und Lagerei-Berufsgenossenschaft v. World Trade Ctr. Props., LLC*, 435 F.3d 136, 139 (2d Cir. 2006).

*Third*, even if Plaintiffs had some claim that did not require intent, knowledge, or deliberate indifference (which they do not), JASTA bars jurisdiction over "tortious . . . acts that constitute mere negligence," 28 U.S.C. § 1605B(d), because Congress had in mind "civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources" to terrorist organizations.  JASTA § 2(a)(7), 130 Stat. 852-53.

### C.      JASTA Requires That the Official's, Employee's, or Agent's Tortious Act Have Caused Plaintiffs' Injuries

The "physical injury to person or property or death" for which Plaintiffs seek to recover must be "caused by" the relevant "tortious act."  28 U.S.C. § 1605B(b).  Here, because Plaintiffs seek to recover for injuries caused by the 9/11 attacks, jurisdiction requires an act that caused those attacks.  Plaintiffs must establish both but-for and proximate causation.

### 1.      JASTA Requires But-For Causation

Section 1605B refers to harm "caused by" tortious acts.  The phrase "caused by" is as direct a way as Congress could have chosen to impose "a requirement of actual causality." *Burrage v. United States*, 134 S. Ct. 881, 887-88 (2014) (describing the "traditional understanding," embodied in sources such as the Model Penal Code, that " '[c]onduct is the cause of a result' if 'it is an antecedent but for which the result in question would not have occurred' "). *Burrage* involved a statute using the phrase "results from," but its reasoning encompassed "phrases *like* 'results from,' " in the absence of any "textual or contextual indication to the contrary."  *Id.* (emphasis added).  Such ordinary causal phrases include "because," *id.* at 888-89 (citing *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)); "because of," *id.* at 889 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)); "based on," *id.* (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007)); and "by reason of," *id.*

(citing, among other cases, *Holmes v. Securities Inv'r Prot. Corp.*, 503 U.S. 258, 265-68 (1992)). JASTA's phrase "caused by" is a similar (if anything, clearer) reference to ordinary causation.

The Second Circuit has applied that same textual approach to the ATA's causation requirement, which permits recovery of damages sustained "by reason of" prohibited conduct. *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), followed *Holmes* and quoted its statement that "by reason of" language "require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 95.  *Terrorist Attacks VI*, in affirming this Court's dismissal of certain nonsovereign defendants, followed *Rothstein* and similarly quoted *Holmes*.  714 F.3d at 123-24.  *Rothstein* and *Terrorist Attacks VI* focused on proximate cause, but their reasoning shows that the ordinary-language analysis of *Burrage*, *Nassar*, *Gross*, *Safeco*, and *Holmes* applies without caveat to terrorism cases.[19]

### 2.    JASTA Requires Traditional Proximate Cause

The phrase "caused by" requires not only but-for causation, but also "what tort law has traditionally called 'proximate causation.'"  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) (construing a similar phrase from the Extension of Admiralty Jurisdiction Act, ch. 526, 62 Stat. 496 (1948)).  Traditionally, proximate causation is an additional hurdle that a plaintiff must cross in addition to but-for causation.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 184 n.17 (2d Cir. 2015) (Calabresi,

---

[19] *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004), on which Plaintiffs have relied in the past, does not help them.  *Kilburn* stated erroneously that the predecessor to 28 U.S.C. § 1605A did not require but-for causation because "the words 'but for' simply do not appear [in the statute]; only 'caused by' do."  *Id.* at 1128.  After the Supreme Court's later decisions in *Burrage*, *Nassar*, *Gross*, and *Safeco* – plus its earlier decision in *Holmes*, which *Kilburn* overlooked – it is clear Congress need not say "but for" to require but-for causation.  A post-*Kilburn* D.C. Circuit decision indicated that the question was open.  *See Owens v. Republic of Sudan*, 531 F.3d 884, 894 (D.C. Cir. 2008) (declining to "decide whether § 1605(a)(7) requires but-for causation").

J.) (discussing the "requirements of common-law causation").  That is why the Supreme Court has said that a RICO plaintiff must establish "*not only* . . . 'but for' cause . . . but . . . proximate cause *as well*," *Holmes*, 503 U.S. at 268 (emphases added), and the Second Circuit has said the same for the ATA, *see Rothstein*, 708 F.3d at 95; *Terrorist Attacks VI*, 714 F.3d at 123-24. JASTA, like RICO and the ATA, incorporates that common-law rule.

Proximate causation includes a requirement that "the alleged violation [of law] led directly to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see Holmes*, 503 U.S. at 268 ("a demand for some direct relation between the injury asserted and the injurious conduct alleged").  *Rothstein* and *Terrorist Attacks VI* apply that general concept to specific claims that a defendant funded terrorism.

*Rothstein* involved claims that UBS was liable to victims of Hizbollah and Hamas because it had provided funds to Iran.  It held that alleged "transfers [of funds] to a state sponsor of terrorism" are not sufficient to plead proximate causation of injuries caused by the terrorists sponsored by that state.  708 F.3d at 97.  To do so, the *Rothstein* plaintiffs needed a "nonconclusory allegation . . . that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS."  *Id.*  Without such an allegation, the plaintiffs failed to state a claim.

*Terrorist Attacks VI* applied the same principle to allegations that certain nonsovereign defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda," which it described as "strikingly similar" to the allegations rejected in *Rothstein*.  714 F.3d at 124.  As the Second Circuit put it:

> These allegations are insufficient for proximate causation purposes for the same
> reasons the allegations in *Rothstein* fell short.  Simply put, plaintiffs do not allege

> that the . . . defendants participated in the September 11, 2001 attacks or that they
> provided money directly to al Qaeda; nor are there factual allegations that the
> money allegedly donated by the . . . defendants to the purported charities actually
> was transferred to al Qaeda and aided in the September 11, 2001 attacks.

*Id.* (citation omitted).  Judge Robertson in an earlier decision similarly applied the non-

commercial-tort exception to dismiss allegations against members of the Saudi royal family:

> In the FSIA context, plaintiffs' allegations that (i) Prince Turki or Prince
> Sultan funded (ii) those who funded (iii) those who carried out the September
> 11th attacks would stretch the causation requirement of the noncommercial tort
> exception not only to "the farthest reaches of the common law," but perhaps
> beyond, to terra incognita.

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 20 (D.D.C. 2003).  Thus, allegations

that a defendant has funded nongovernmental charities that in turn, at some indeterminate point,

purportedly provided some indeterminate degree of support for Al Qaeda or other terrorist

organizations fall short of proximate cause under either the ATA or the FSIA.[20]

Plaintiffs have erroneously argued that JASTA's causation requirement "requires only

some 'reasonable connection' between defendant's actions and plaintiffs' injuries," which they

describe as a "flexible standard" different from traditional causation.  CAC ¶ 13.  They rely on a

floor statement by one of JASTA's sponsors, *id.*, which has little weight and cannot change the

statute's clear language.[21]  The legislative history is also ambiguous:  JASTA's sponsors also

---

[20] This Court has accepted allegations that a bank, after alleged warnings from the U.S.
government, provided Al Qaeda with "direct and specific banking services [that] allegedly
included the transfers of money to two of the [9/11] hijackers; which monies are claimed to have
been used specifically to prepare for the 9/11 attacks."  *In re Terrorist Attacks on September 11,
2001*, 718 F. Supp. 2d 456, 493 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*").  That ruling illustrates
the kind of direct, knowing assistance that may suffice; it is fully consistent with *Rothstein* and
*Terrorist Attacks VI*.

[21] *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("[F]loor statements by
individual legislators rank among the least illuminating forms of legislative history."); *Barnhart
v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002) (refusing "to give greater weight to the views of
two Senators than to the collective votes of both Houses, which are memorialized in the
unambiguous statutory text").

described the causation requirement as incorporating "traditional principles of foreign sovereign immunity," 162 Cong. Rec. S2845 (daily ed. May 17, 2016) (statement of Sen. Cornyn), and as making the bill "as narrow and targeted as possible," *id.* (statement of Sen. Schumer).  This Court should heed the Supreme Court's warning against "allowing ambiguous legislative history to muddy clear statutory language."  *Milner v. Department of Navy*, 562 U.S. 562, 572 (2011).

> ### D.   JASTA Does Not Change Any Pleading or Evidentiary Requirements
>
> #### 1.   Plaintiffs Must Plead Concrete Facts and Come Forward with Competent Evidence

JASTA did not change established procedure on an FSIA motion to dismiss.  As this Court has recognized, Saudi Arabia is entitled to "'challenge either the legal or factual sufficiency' of Plaintiffs' assertion of jurisdiction" under the FSIA, and here Saudi Arabia "challenge[s] both."  *Terrorist Attacks IX*, 134 F. Supp. 3d at 780 (quoting *Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001)).  As for the legal challenge, the Court applies the familiar Rule 12(b)(6) standard, "tak[ing] all facts alleged in the complaint as true and draw[ing] all reasonable inferences in favor of" Plaintiffs, *id.*, but subject to the rule that "conclusory allegations are not entitled to be assumed true," *id.* at 783 (citing *Iqbal*, 556 U.S. at 679); *see also Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (explaining that plaintiffs must have plausible allegations – not "bald assertions" or "[c]onclusory allegations" – sufficient to establish jurisdiction).

As for the factual challenge, Saudi Arabia must initially "present[ ] a prima face case that it is a foreign sovereign," *Terrorist Attacks IX*, 134 F. Supp. 3d at 779, but Plaintiffs admit that, *e.g.*, CAC ¶ 22.  Plaintiffs must then carry a "'burden of going forward with evidence showing that under the FSIA's exceptions [Saudi Arabia] lack[s] immunity.'"  *Terrorist Attacks IX*, 134 F. Supp. 3d at 787 (quoting *Virtual Countries*, 300 F.3d at 242).  That evidence must be

admissible, competent, and sufficient "to create a material issue of fact." *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) (no "conclusory and hearsay statements"); *Terrorist Attacks I*, 349 F. Supp. 2d at 799 ("none of these exhibits amount to *admissible* evidence that Prince Sultan or Prince Turki knew the charities they supported were fronts for al Qaeda") (emphasis added).  If, and only if, Plaintiffs come forward with "sufficient evidence to carry [their] burden of production," then the Court "resolve[s] disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion."  *Robinson*, 269 F.3d at 141.

 *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 137 S. Ct. 1312 (2017), confirms that Plaintiffs must both plead facts and come forward with sufficient evidence to support jurisdiction.  In that case, the Supreme Court held that, to exercise jurisdiction under the FSIA's expropriation exception, a district court must "find that the property in which the [plaintiff] claims to hold rights was indeed 'property taken in violation of international law,'" as the exception requires.  *Id.* at 1316 (quoting 28 U.S.C. § 1605(a)(3)).  Where that decision can be made as a matter of law – because the allegations are inadequate – the court should make it "at the outset of the case."  *Id.* at 1324.  Where it "requires resolution of factual disputes, the court will have to resolve those disputes, but it should do so as near to the outset of the case as is reasonably possible."  *Id.*

 *Helmerich & Payne* thus removes any doubt that this Court should determine both legally and factually whether JASTA's exception is satisfied (by a tortious act, within the scope of agency or employment, that caused the 9/11 attacks) before exercising jurisdiction.  Plaintiffs have previously argued that "jurisdictional fact[s] bound up in [a] merits determination should be

resolved at [the] merits or summary judgment stage,"[22] but that argument (always contrary to

precedent) has now been rejected by a unanimous Supreme Court:

> We recognize that merits and jurisdiction will sometimes come
> intertwined. . . . Perhaps [a jurisdictional issue] is the only serious issue in the
> case.  If so, the court must still answer the jurisdictional question.  If to do so, it
> must inevitably decide some, or all, of the merits issues, so be it.

*Id.* at 1319.  And *Helmerich & Payne* reaffirms that this rule protects "foreign sovereign

immunity's basic objective, namely, to free a foreign sovereign from *suit*."  *Id.* at 1316-17.

### 2.     The 9/11 Report, FBI-CIA Report, and 9/11 Review Report Are Competent Evidence

The Court can and as necessary should give weight to the findings of the 9/11

Commission, Ex. 1; the FBI and CIA, Ex. 4; and the 9/11 Review Commission, Ex. 5, as

evidence that Plaintiffs cannot make the required jurisdictional showing under JASTA.  Those

findings are "record[s] or statement[s] of . . . public office[s]" that "set[ ] out" various "factual

findings from . . . legally authorized investigation[s]."  Fed. R. Evid. 803(8)(A)(iii).  They are

therefore usable "in a civil case" unless Plaintiffs can "show that the source of information or

other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(A)(iii), (B).

Judge Hellerstein ruled in litigation involving claims against certain airlines that

"relevant and appropriate findings made by the [9/11] Commission are potentially trustworthy

and admissible."  *In re September 11 Litig.*, 621 F. Supp. 2d 131, 156 (S.D.N.Y. 2009) ("*9/11

Airline Case*").  He found "no basis to distinguish [t]he 9/11 Report from any other public office

or agency report.  It is a report of a public commission, pursuant to an Act of Congress, written

following an investigation by staff and Commissioners appointed pursuant to that Act."  *Id.* at

155.  Further, "[t]he Commission heard 160 witnesses, was free from bias, and conducted public

---

[22] Reply Br. for Plaintiffs-Appellants at 3-4, *In re Terrorist Attacks on September 11,
2001*, No. 15-3426-cv(L), ECF No. 248 (2d Cir. filed July 25, 2016).

hearings that were the adequate equivalent of cross-examination in protecting litigants' rights."
*Id.* at 156. Certain parts of the 9/11 Report might, however, be inadmissible because they relied
on information obtained through "torture or other questionable investigative techniques." *Id.*[23]

This Court should similarly conclude that findings of the 9/11 Report, to the extent based
on ordinary investigative techniques such as reviewing documents and interviewing witnesses,
are trustworthy and admissible. Examples include the 9/11 Commission's findings of "no
credible evidence that [Omar Al Bayoumi] believed in violent extremism or knowingly aided
extremist groups," based on the judgment of "investigators who ha[d] dealt directly with him and
studied his background," 9/11 Report 218; and that "after exploring the available leads," which
the Report documented in detail, *id.* at 217, 515 n.14, it had "not found evidence that [Fahad Al]
Thumairy provided assistance" to the 9/11 hijackers, *id.* at 217.

The Court may also rely on the 9/11 Report for background facts that undermine
Plaintiffs' baseless contentions that Saudi Arabia conspired with Al Qaeda to attack the United
States. Examples include the 9/11 Commission's factual findings that:

- in 1994, Saudi Arabia froze the assets of Osama Bin Laden, Al Qaeda's founder, and revoked his citizenship, *id.* at 57, 170;

- in 1995, terrorists who "admitted being inspired by Bin Ladin" were convicted of a bombing in Riyadh, *id.* at 60;

- as of early 1996, Bin Laden believed that the "Egyptian or Saudi regimes, or both," were trying to have him killed, *id.* at 63;

- in August 1996, Bin Laden issued a "self-styled fatwa" that "condemned the Saudi monarchy" for permitting American soldiers in Saudi Arabia, *id.* at 48;

- in the spring of 1998, Saudi Arabia "quietly disrupted Bin Ladin cells in its country that were planning to attack U.S. forces with shoulder-fired missiles," *id.* at 115; and

---

[23] Judge Hellerstein also ruled that Commission staff materials (*e.g.*, the Terrorist
Financing Monograph and Staff Statements) are not evidence. *9/11 Airline Case*, 621 F. Supp.
2d at 155. Saudi Arabia relies on such materials not as freestanding evidence but to show the
trustworthiness of the 9/11 Report and to rebut Plaintiffs' misstatements of the staff's views.

- later in 1998, officials at the highest levels of the Saudi government worked with the United States, trying to have Bin Laden expelled from Afghanistan, *id.* at 115, 121-22.

Those facts supported the Commission's ultimate finding of "no evidence that the Saudi government as an institution or senior Saudi officials individually funded" Al Qaeda. *Id.* at 171.

To the extent Plaintiffs contend that the 9/11 Commission's thorough investigation did not in 2004 uncover all possible evidence, *see, e.g.*, ECF No. 2926, at 17-18, the trustworthiness of those findings have been reinforced by the later findings of the FBI, the CIA, and the 9/11 Review Commission, which are also independently admissible under Rule 803(8)(A)(iii).

### 3.    Plaintiffs' Opposing Materials Are Not Competent Evidence

Plaintiffs have tried but failed to support their case with inadmissible and unreliable materials, none of which is evidence under Rule 803(8) or otherwise.

**a.    Part Four (the "28 pages").**  Plaintiffs cannot rely on Part Four of the December 2002 Joint Inquiry Report, frequently called "the 28 pages," *see* CAC App'x 2, because it is not evidence.  Part Four states that it is based on a "review of FBI and CIA documents" but that the "Joint Inquiry . . . did not attempt to investigate and assess the accuracy and significance of this information independently, recognizing that such a task would be beyond [its] scope." *Id.* at 416.  Thus, Part Four does not make "factual findings" as required by Rule 803(8)(A)(iii) and cannot (in light of its own disclaimer of accuracy) be deemed trustworthy.[24]

**b.    Affirmations of Former Officials.**  Plaintiffs cannot rely on affirmations from former members of the Joint Inquiry (such as Senator Graham or Senator Kerrey, ECF Nos.

---

[24] When Part Four was declassified, the Office of the Director of National Intelligence publicly stated that the release "does not indicate the Intelligence Community's agreement with Part Four's accuracy or concurrence with any information it contains"; that the Joint Inquiry concededly did not "'conduct the kind of extensive investigation that would be required to determine the true significance of . . . alleged support to the [9/11] hijackers'"; and that the 9/11 Commission had "greater access to senior officials and classified information."  Ex. 6, at 2.

2927-2, 2927-4) or the 9/11 Commission (such as former Secretary Lehman, ECF No. 2927-3) that they personally favor further investigation of the 9/11 attacks and Saudi Arabia. Testimony from former officials is not a "record or statement of a public office" and so does not satisfy Rule 803(8). Nor can such testimony be admitted as expert opinion under Federal Rule of Evidence 702 (as Plaintiffs have suggested) because it lacks any reliable methodology or factual basis.

       **c.**     **Preliminary Investigative Materials.** Plaintiffs cannot rely on memoranda and other documents that state the beliefs or preliminary conclusions of investigators, such as a heavily redacted memorandum dated October 5, 2012, and prominently stamped "FloridaBulldog.org," which purports to summarize the status of an FBI investigation ongoing at the time, *see* CAC App'x 3 ("Florida Bulldog Memorandum"), or a set of June 2003 "work plans" from the 9/11 Commission staff, *see* CAC App'x 4. Such materials do not reflect the "findings" of a "public office," Fed. R. Evid. 803(8), *see 9/11 Airline Case*, 621 F. Supp. 2d at 155, and therefore are not evidence. They do not help Plaintiffs even as grist for their pleadings because "preliminary steps in litigations and administrative proceedings that d[o] not result in an adjudication on the merits . . . are, as a matter of law, immaterial." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011) (discussing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), and its progeny). That rule is all the more important where – as here – completed investigations ultimately found no evidence to support the preliminary suspicions on which Plaintiffs rely.

       **d.**     **Other Materials.** The remainder of Plaintiffs' purported evidence is, as Saudi Arabia showed in its last motions to dismiss, either obviously deficient as evidence (including such patent hearsay as newspaper and magazine articles, popular history books, and blog posts) or otherwise immaterial. ECF No. 2948-1. JASTA has changed none of that.

## II.   Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Individual

### A.   The Consolidated Amended Complaint

Plaintiffs have never alleged that any official, employee, or agent of Saudi Arabia planned or carried out the 9/11 attacks.  Their most recent complaint similarly focuses on baseless allegations that "individual Saudi government employees and agents knowingly provided material support to the September 11th hijackers and plotters."  CAC ¶ 34; *see also id.* ¶¶ 36, 157-158, 265.  Plaintiffs name eight individuals who assertedly did so:

- **Omar Al Bayoumi**, an employee of Saudi Arabia's civil aviation regulatory agency, seconded to government contractor Dallah Avco, *see infra* Part II.A.1;

- **Fahad Al Thumairy**, an imam at the King Fahd mosque in Los Angeles who held a Saudi Arabian consular visa, *see infra* Part II.A.2;

- **Osama Basnan** (sometimes spelled "Bassnan"), a businessman and purported friend or associate of Al Bayoumi, *see infra* Part II.A.3;

- **Saleh Al Hussayen**, a religious scholar, *see infra* Part II.A.4;

- **Mohammed Al Qudhaieen** and **Hamdan Al Shalawi**, two students, *see infra* Part II.A.5;

- **Mohammed Jabar Fakihi**, a payroll accountant for Saudi Arabia's Ministry of Islamic Affairs, *see infra* Part II.A.6; and

- **Omar Abdi Mohamed**, a religious worker who established a charity and was later convicted of immigration fraud, *see infra* Part II.A.7.

*See* CAC ¶ 265; *see also id.* ¶¶ 165-306.  Of those eight, this Court has rejected allegations about four (Al Hussayen, Basnan, Al Bayoumi, and Al Thumairy) without invoking the entire-tort rule or the discretionary-function exception.  *See Terrorist Attacks IX*, 134 F. Supp. 3d at 785-87.[25]

---

[25] Plaintiffs' allegations against Mohammed Jabar Fakihi are not literally new, *see* Aver. ¶¶ 252-263 (discussion in previous filing), but JASTA changes the analysis of those allegations. *See* ECF No. 2928, at 26 n.34 (Saudi Arabia's argument that allegations against Fakihi were irrelevant under the entire-tort rule and the discretionary-function exception).  As set forth in Part II.A.6, a post-JASTA analysis ultimately leads to the same conclusion:  that Plaintiffs' allegations about Fakihi are both legally insufficient and unsupported by evidence.

As set forth in Part I, Plaintiffs must allege and come forward with sufficient evidence for the Court to find that one of these individuals (1) acted on behalf of Saudi Arabia within the scope of employment or agency in (2) committing a tortious act – here, knowingly providing substantial assistance to Al Qaeda – that (3) caused the 9/11 attacks.  Plaintiffs cannot do so.

### 1.     Omar Al Bayoumi

As they have before, Plaintiffs rely prominently on allegations about Omar Al Bayoumi.  But their new complaint remains short on "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, about him.  Plaintiffs' factual allegations consist of the following:  Two weeks after hijackers Al Hazmi and Al Mihdhar arrived in the United States, Al Bayoumi allegedly met for an hour with Al Thumairy at the Saudi Arabian consulate in Los Angeles.  CAC ¶ 170.  After that meeting, Al Bayoumi allegedly met Al Hazmi and Al Mihdhar at a nearby restaurant and offered to help them settle in San Diego.  *Id.* ¶ 172.  Al Bayoumi allegedly helped them find an apartment, co-signed a lease, opened a bank account for them with money from his own account, and occasionally paid their rent.  *Id.* ¶¶ 173, 175.  He also allegedly "took steps to ensure" that they received assistance from other San Diego Muslims.  *Id.* ¶¶ 174, 185-186, 188, 196.

Plaintiffs assert that Al Bayoumi was an employee or agent of Saudi Arabia's Ministry of Islamic Affairs during this period.  *Id.* ¶¶ 171, 218.  As purported support for that assertion, Plaintiffs allege that he entered the United States on a student visa but did not pursue meaningful academic studies, *id.* ¶¶ 219-220; that he received a salary from Saudi Arabia for job duties he never performed and received a donation to start a mosque, *id.* ¶¶ 221-222, 231; that he contacted the Saudi Arabian embassy and consulate many times, *id.* ¶¶ 225-227; that he "videotap[ed]" or "monitor[ed]" the activities of Saudi Arabian citizens, *id.* ¶¶ 239-241; and that he met with Al Thumairy and was "tasked" with assisting the hijackers, *id.* ¶¶ 244-245.  Plaintiffs also allege

that Al Bayoumi "support[ed] . . . causes within the core mission of the Ministry of Islamic Affairs," *id.* ¶¶ 230-233, and "maintained extensive connections to extremist clerics," *id.* ¶ 236.

None of these allegations is sufficient, and there is no credible evidence – and certainly none to overcome the unanimous contrary findings of the 9/11 Commission, the FBI, the CIA, and the 9/11 Review Commission – to support Plaintiffs' conclusory assertion that Al Bayoumi, acting within the scope of employment, committed a tortious act that caused the 9/11 attacks.

> **a.** **No Action Within Scope of Employment or Agency.**  This Court previously found that Plaintiffs presented "insufficient allegations and no credible evidence to support Plaintiffs' contention that al Bayoumi provided material support to two of the hijackers, Nawaf al Hazmi and Khalid al Mihdhar, within the scope of his employment." *Terrorist Attacks IX*, 134 F. Supp. 3d at 786-87.[26]  "[N]one of the[] allegations attempt to draw any connection between [Al Bayoumi's employment] and his alleged material support to the hijackers." *Id.* at 786.  That holding was consistent with the 9/11 Commission's conclusion that Al Bayoumi was "an unlikely candidate for clandestine involvement with Islamist extremists," 9/11 Report 218; with the joint FBI-CIA finding in 2005 of "no information to indicate that" Al Bayoumi was an "intelligence officer[] of the Saudi Government," 2005 FBI-CIA Summary 2; with the 9/11 Review Commission's reaffirmance of the 9/11 Commission's conclusion in 2015; and with the Solicitor General's advice to the Supreme Court in 2009 that Plaintiffs' allegations regarding Al Bayoumi were insufficient and conclusory, *see* U.S. Amicus Br. 16-17 n.4.

---

[26]  This Court found it unnecessary to decide whether at the time in question Al Bayoumi was a Civil Aviation employee of Saudi Arabia or an employee of aviation contractor Dallah Avco.  *See Terrorist Attacks IX*, 134 F. Supp. 3d at 786-87 (allegation and evidence insufficient even "assuming he was a Civil Aviation employee of Saudi Arabia").  So too here.

Plaintiffs' latest allegations regarding Al Bayoumi's alleged employment or agency relationship with Saudi Arabia have not materially changed.  Now, as previously, Plaintiffs allege that Al Bayoumi was paid by the Saudi Arabian government for a job he did not perform, *compare* CAC ¶¶ 219-224, 230-231, *with* Aver. ¶¶ 153-154, 157, 181-189; that Al Bayoumi communicated with the Saudi Arabian embassy and consulate, *compare* CAC ¶¶ 225-227, 229, *with* Aver. ¶¶ 193-194; that Al Bayoumi had contacts with other supposed 9/11 perpetrators and extremist clerics, *compare* CAC ¶¶ 228, 232-237, 244-245, *with* Aver. ¶¶ 162, 167, 174, 176, 196, 208-209; and that Al Bayoumi monitored other Saudi Arabian citizens in the United States, *compare* CAC ¶¶ 238-241 *with* Aver. ¶¶ 119, 149, 194.

Because Plaintiffs rest on the same allegations as before, this Court's prior ruling applies with equal force.  Plaintiffs' repackaging of their allegations merely amounts to a (nominally) different theory of the inferences to be drawn from their previous allegations:  instead of saying that Al Bayoumi was an "intelligence agent" of Saudi Arabia, Aver. ¶ 149, they now call him an employee or agent of the Ministry of Islamic Affairs, CAC ¶¶ 171, 218.  That changes nothing.  Plaintiffs provide no factual allegations – let alone evidence – to define the scope of Al Bayoumi's purported employment or agency relationship with Saudi Arabia or to show that supporting terrorism fell within the scope of that relationship.  Rather, Plaintiffs' factual allegations are "not only compatible with, but indeed . . . more likely explained by," *Iqbal*, 556 U.S. at 680, a conclusion that Al Bayoumi was merely a well-connected Saudi Arabian expatriate pursuing an education in the United States at government expense.  Nothing else in Plaintiffs' allegations about his relationship with Saudi Arabia is "entitled to the assumption of truth."  *Id.* at 679.

Plaintiffs cannot overcome that conclusion by relying on Part Four of the Joint Inquiry Report.  Part Four states that Al Bayoumi applied to schools with a letter from the Saudi embassy

stating that he had a scholarship from Saudi Arabia, that he was paid for a job he seldom performed, that the "FBI received information that al-Bayoumi had received $400,000 from Saudi Arabia to help fund a new mosque in San Diego," and that Al Haramain "was interested in appointing the imam of the mosque in [El] Cajon, California, that al-Bayoumi managed." CAC App'x 2, at 423-24, 436 (relied upon by CAC ¶¶ 158(h), 219, 231-232). But Part Four is not evidence. *See supra* Part I.D.3.a. And, even if Plaintiffs could prove those facts, they would not show any employment or agency relationship with Saudi Arabia, especially because Plaintiffs elsewhere admit that the El Cajon mosque was funded by a private philanthropist. Aver. ¶ 181.

Based on its more thorough investigation, the 9/11 Commission concluded that Al Bayoumi "was in the United States as a business student, supported by a private contractor for the Saudi Civil Aviation Authority, where [he] had worked for over 20 years," 9/11 Report 218; and found "no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups," *id.* The 2005 FBI-CIA Report and the 9/11 Review Commission affirmed those conclusions. *See* 2005 FBI-CIA Summary 2; 9/11 Review Report 103.

Plaintiffs also err in relying on the Florida Bulldog Memorandum. CAC App'x 3. Although the document's authors have been redacted, *see id.*, Plaintiffs attribute this document to "the FBI and DOJ," and say it was released "in response to a Freedom of Information Act lawsuit." CAC ¶ 156. It contains hearsay statements that Al Bayoumi and Al Thumairy were "known to have provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar," that an unnamed individual "tasked al-Thumairy and al-Bayoumi with assisting the hijackers," and that Al Bayoumi "was living in San Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never

- 28 -

performed." CAC App'x 3, at 3-4 (relied upon by CAC ¶¶ 36, 158, 222, 244).[27]  Even if this document were evidence – which it is not, *see supra* Part I.D.3.c – neither the conclusory assertions about "substantial assistance" and "task[ing]" nor the minimal factual allegations about Al Bayoumi add to Plaintiffs' previous, insufficient showing.

Finally, Plaintiffs also err in relying on a document they call "Document 17," a set of "work plans" for the 9/11 Commission staff as of June 6, 2003.  CAC App'x 4.  Although the work plans make speculative statements about "[p]ossible" connections between Saudi Arabia and the 9/11 attacks, *id.* at 7,[28] Plaintiffs cite them only for a single statement that Al Bayoumi was a "close associate" of "an imam in Norway" with "suspected" ties to Al Qaeda, *id.* at 35, *cited in* CAC ¶ 236.  Even if true, that hardly shows that Al Bayoumi himself was an extremist or Al Qaeda member.  The work plans also are not evidence, *see supra* Part I.D.3.c, and are superseded by the staff's final statement that it "ha[d] not uncovered evidence" that Al Bayoumi "kn[ew] that [the hijackers] were terrorists, or that he believed in violent extremism," Staff Statement No. 16, at 5, as well as by the Commission's own findings, *see* 9/11 Report 218.

**b.    No Tortious Act.**  Plaintiffs also fail to allege or come forward with evidence that Al Bayoumi knew of or recklessly disregarded Al Hazmi's or Al Mihdhar's plans.  *See supra* Part I.B.  The only plausible inference to be drawn from Plaintiffs' allegations is that Al

---

[27] The statement that Al Bayoumi "receiv[ed] a salary from the Kingdom of Saudi Arabia," CAC App'x 3, at 3-4, is contradicted by Plaintiffs' own allegations, Aver. ¶ 157, that Al Bayoumi received a salary from Dallah Avco, reimbursed by Saudi Arabia under contract.

[28] The work plans state that unidentified members of the "Muslim community in San Diego believed that [Al Bayoumi] was a Saudi intelligence officer"; that "[t]he FBI believes it is possible that he was an agent of the Saudi Government"; and that Al Hazmi once warned someone "to stay away from [Al Bayoumi] because he was a Saudi spy."  CAC App'x 4, at 7, 46.  None of those statements is a plausible allegation or evidence.  Further, an assertion that Al Hazmi warned an associate *against* Al Bayoumi as a Saudi agent cuts against Plaintiffs' implausible story that Al Bayoumi knowingly helped Al Hazmi and Al Mihdhar *on behalf of* Saudi Arabia.

Bayoumi – "a devout Muslim, obliging and gregarious," 9/11 Report 218 – was merely helping fellow Muslims and Saudi Arabians acclimate to a foreign country.

      *First*, Plaintiffs err in relying on the statement in the Florida Bulldog Memorandum that its unnamed author "seeks to prove" that Al Bayoumi and Al Thumairy "provided . . . assistance" to Al Hazmi and Al Mihdhar "with the knowledge that [they] were here to commit an act of terrorism." CAC ¶ 158 (quoting CAC App'x 3, at 4). A statement that an investigator "seeks to prove" a legal conclusion is neither an appropriate allegation nor competent evidence. *See supra* Part I.D.3.c. That is especially so here because the investigator's attempt failed: the 9/11 Review Commission later found as of March 2015 that new evidence available to the FBI was "not sufficient" to support the conclusion that Plaintiffs advocate. 9/11 Review Report 103.

      *Second*, Plaintiffs cannot establish Al Bayoumi's knowledge using a statement by former 9/11 Commissioner John Lehman that he "believe[s]" Al Bayoumi "knew that al Mihdhar and al Hazmi were bad actors who intended to do harm to the United States." CAC ¶ 213. Mr. Lehman's personal beliefs not only are contrary to the findings of the 9/11 Commission (which Mr. Lehman signed), the 9/11 Review Commission, and the FBI, but also are neither competent allegations nor admissible evidence. *See supra* Part I.D.3.b. As this Court has previously explained, it cannot "rely on the[] opinions" of former officials when Plaintiffs fail to come forward with "facts which would support" such opinions. ECF No. 2986, at 44:4-6.[29]

      **c.**    **No Causation.** Plaintiffs also fail to allege or come forward with evidence that the 9/11 attacks were "caused by" Al Bayoumi's alleged assistance. JASTA § 3(a), 130 Stat.

---

[29] Senator Graham, on whom Plaintiffs rely for other matters, CAC ¶ 212, has stated publicly that there is "'no evidence that [Al] Bayoumi knew what was going on.'" Dan Christensen & Anthony Summers, BrowardBulldog.org, *Graham: FBI report raises questions about who helped 9/11 terrorists*, Miami Herald (FL), Apr. 18, 2013, 2013 WLNR 9467587.

853.  The 9/11 Commission rejected "speculation" that Al Bayoumi was a conduit of funds to the

hijackers.  *See* 9/11 Report 219 ("Neither [on February 4, 2000] nor later did Bayoumi give money

to either Hazmi or Mihdhar . . . ."); *see also* Terrorist Financing Monograph 138.  Plaintiffs

assert otherwise, *e.g.*, CAC ¶ 173, but have no evidence.  The remaining assistance that Al

Bayoumi supposedly provided consisted of helping Al Hazmi and Al Mihdhar find an apartment

and acclimate to the local Muslim community.  *Id.* ¶¶ 173-175, 185, 188.  Plaintiffs proffer no

plausible allegations or evidence that those neighborly acts caused the 9/11 attacks.  *See supra*

Part I.C; *cf. Rothstein*, 708 F.3d at 97 (no causation under ATA without factual allegations that

"moneys . . . were in fact sent to" terrorists or that absent funds the recipient "would have been

unable to fund the attacks").

### 2.  Fahad Al Thumairy

Plaintiffs' factual allegations and evidence regarding Fahad Al Thumairy are even more

deficient than their effort as to Al Bayoumi.  They allege that Al Thumairy "tasked" Al Bayoumi

with assisting Al Hazmi and Al Mihdhar, supposedly at the direction of an unnamed third

person.  CAC ¶¶ 169-171, 244-245.  As for employment and agency, Plaintiffs allege Al

Thumairy was the resident imam at the King Fahd mosque near Los Angeles by appointment of

the Ministry of Islamic Affairs and was "employed by the Islamic Affairs Department of the

Saudi consulate in Los Angeles, where he held diplomatic credentials."  *Id.* ¶¶ 165-167; *see id.*

¶¶ 215-216.  They also say he was "an extremist Wahhabi cleric," banned from the United States

in 2003 based on apparent ties to terrorism.  *Id.* ¶¶ 166, 168, 217.  Those allegations echo

Plaintiffs' prior claims.  Aver. ¶¶ 162 (meeting between Al Bayoumi and Al Thumairy), 163-165

(employment at the mosque and consulate), 166 (conservative leanings), 171 (banned).

### a.  No Action Within Scope of Employment or Agency.

This Court previously

concluded that Plaintiffs had given it "no basis . . . to find that al Thumairy was acting within the

scope of his employment." *Terrorist Attacks IX*, 134 F. Supp. 3d at 787.  Nothing in their latest complaint fixes that problem.  Even if there were competent allegations or evidence that Al Thumairy helped Al Hazmi or Al Mihdhar, it would have been "a clear departure from the scope of [his alleged] employment," *N.X.*, 765 N.E.2d at 847, as a religious leader.

      **b.**    **No Tortious Act.**  Plaintiffs have also failed to allege properly or to come forward with evidence that Al Thumairy assisted the hijackers.  They rely solely on a single conversation that Al Thumairy allegedly had with Al Bayoumi.  CAC ¶¶ 169-171.  But, as this Court explained, Plaintiffs have no "evidence as to what conversations [Al Thumairy] might have had with Bayoumi or any contacts that he might have had with the hijackers."  ECF No. 2986, at 37:12-14.  All they have is a sequence of events – the alleged conversation preceded Al Bayoumi's meal with Al Hazmi and Al Mihdhar – and rank speculation that one must have led to the other.  That is not enough.  Further, the 9/11 Commission "found [no] evidence that Thumairy provided assistance to the [hijackers]."  9/11 Report 217; *see also* 9/11 Review Report 102-03.  And, even assuming Al Thumairy directed Al Bayoumi to assist the hijackers, there is no allegation or evidence that he knew of or recklessly disregarded the hijackers' plans.

      Plaintiffs' latest submission includes no new allegations that Al Thumairy had culpable knowledge.  Their new appendices also add nothing meaningful.  Part Four states that Al Thumairy "may have been in contact" with Al Hazmi and Al Mihdhar, CAC App'x 2, at 417, 430; the Florida Bulldog Memorandum, that he "assigned an individual to take care of them during their time in the Los Angeles area," CAC App'x 3, at 4; and Document 17, that Al Thumairy met Al Bayoumi before the latter "went to the restaurant where he met the hijackers," CAC App'x 4, at 7, 36.  That merely repeats Plaintiffs' previous, deficient showing.

c.      **No Causation.**  Finally, Plaintiffs have no proper allegations or evidence that Al

Thumairy caused the 9/11 attacks.  Because any assistance Al Bayoumi gave the hijackers did

not cause 9/11, *see supra* Part II.A.1.c, the same is true of Al Thumairy's even further attenuated

connection to the attacks, which consisted of purportedly directing Al Bayoumi to assist.[30]

3.      **Osama Basnan**

Plaintiffs have neither proper allegations nor evidence to show that Osama Basnan was

an employee or agent of Saudi Arabia or that he did anything to help the 9/11 hijackers.  They

allege that Basnan and Al Bayoumi were friends, CAC ¶ 199; that, around the time that Al

Hazmi and Al Mihdhar came to the United States, Basnan's wife began giving money to Al

Bayoumi's wife, *id.* ¶¶ 204-205; and that Basnan told an FBI source that "he did more for the

hijackers than al-Bayoumi did," *id.* ¶ 201.  Plaintiffs further allege that Basnan was sympathetic

to Al Qaeda, *id.* ¶ 200, and in contact with Anwar Aulaqi, *id.* ¶ 202.  Those allegations are

materially identical to those previously rejected by the Court,[31] which found Plaintiffs'

employment and agency allegations regarding Basnan were "entirely conclusory."  *Terrorist*

*Attacks IX*, 134 F. Supp. 3d at 785.  Those deficiencies persist in the CAC.

a.      **No Action Within Scope of Employment or Agency.**  Plaintiffs add two new,

insufficient allegations about Basnan's purported employment or agency.  *First*, their claim that

---

[30] Plaintiffs add one allegation about "a member of the King Fahd Mosque named Benomrane," whom Al Thumairy allegedly "tasked . . . to assist the hijackers."  CAC ¶ 169. That conclusory allegation was rejected by the 9/11 Commission.  *See* 9/11 Report 515 n.14 ("After checking many possible avenues of corroboration for this story, our investigation has not substantiated the hypothesis that Benomrane's 'two Saudis' were Hazmi and Mihdhar.  In fact, we have established that Benomrane did not obtain a taxi license, or even a driver's license, until months after he could be supposed to have chauffeured Hazmi and Mihdhar.").

[31] Aver. ¶¶ 200-201 (money to Al Bayoumi's wife, boast about hijackers), 203 (Al Qaeda sympathy), 205 (friendship with Al Bayoumi).

Basnan was a "past employ[ee]" of "the Saudi Arabian Education Mission," CAC ¶ 252, is unsupported by evidence and says nothing about agency or employment at the relevant time.[32]

*Second*, the Joint Inquiry's statement that "a CIA memo" said that an unidentified source "reported[ ]" that Basnan "received funding . . . from Saudi Government officials," *id.* ¶ 253,[33] is neither a proper allegation nor evidence. Plaintiffs do not say when this purported funding was provided, how much it was, what services Basnan provided in return, or whether or how the unidentified funders "exercise[d] control" over any of Basnan's activities. *See In re Best*, 95 A.D.3d 1536, 1537-38 (N.Y. App. Div. 2012) (no employment relationship absent control).[34]

**b.    No Tortious Act.** The Court previously refused "[t]aking [Plaintiffs'] allegations together . . . even loosely [to] infer that Basnan provided support to al Bayoumi with the intention that the support would go to the hijackers." *Terrorist Attacks IX*, 134 F. Supp. 3d at 785. Plaintiffs present no new allegations or evidence to warrant a different result.

**c.    No Causation.** Finally, as with Al Thumairy, Plaintiffs cannot establish that Basnan caused the 9/11 attacks. Plaintiffs allege that Basnan provided assistance to the hijackers only through Al Bayoumi, CAC ¶¶ 204-205; and, as explained above, they have failed to allege or prove that any assistance from Al Bayoumi caused the 9/11 attacks. *See supra* Part II.A.1.c.

---

[32] Plaintiffs also offer no details about what the "Saudi Arabian Education Mission" is or how it "fall[s] under the Ministry of Islamic Affairs' authority." CAC ¶ 252. They may mean the Saudi Arabian Cultural Mission, which is part of the Saudi Arabian embassy, but for some purposes reports to the Ministry of Higher Education (not Islamic Affairs). *See* Saudi Arabian Cultural Mission, *About SACM*, http://www.sacm.org/AboutSACM.aspx.

[33] The same source said that unnamed officials "possibly" gave Basnan a "fake passport," CAC ¶ 253, but "more than a sheer possibility," *Iqbal*, 556 U.S. at 678, is required here.

[34] It is not uncommon for Saudi Arabian citizens to receive financial support from their government without being its employees or agents. *See, e.g.*, Al Arabiya, *How Will Saudi Arabia Distribute Its Financial Support to Its Citizens*? (Dec. 22, 2016), http://english.alarabiya.net/en/business/economy/2016/12/22/Monthly-financial-support-announced-for-Saudi-citizens.html.

### 4.  Saleh Al Hussayen

This Court previously rejected Plaintiffs' allegations concerning Saleh Al Hussayen because "Plaintiffs [had] allege[d] no facts and provide[d] no evidence to support that Hussayen was a Saudi official acting in any official capacity at the relevant time," and because "there is no allegation – let alone evidence – that he assisted the hijackers within the scope of his employment or otherwise." *Terrorist Attacks IX*, 134 F. Supp. 3d at 785.  Plaintiffs have come forward with nothing to support a different result here.

Plaintiffs allege that Al Hussayen was a senior Saudi cleric who had held positions within the Saudi government at various times.  CAC ¶¶ 281, 285.  He purportedly arrived in Virginia on September 6, 2001, and switched from his original hotel to the hotel where hijackers Al Hazmi, Al Mihdhar, and Hanjour were staying.  *Id.* ¶ 283.[35]  Plaintiffs further allege that, after 9/11, FBI agents attempted to interview Al Hussayen, but he feigned a seizure and departed the United States.  *Id.* ¶ 284.  Plaintiffs further allege that FBI agents believed Al Hussayen was being deceptive when he claimed not to know the hijackers.  *Id.* ¶ 285.  Plaintiffs made nearly identical allegations in their Averment (at ¶¶ 231, 232, 237, 239), which the Court rejected.

Plaintiffs still have neither allegations nor evidence that Al Hussayen was acting within the scope of any employment or agency, that switching hotels had anything to do with 9/11, or that he helped the hijackers.  Their sole new allegation is from Part Four, which states that Al Hussayen "apparently" is a Saudi government employee.  CAC App'x 2, at 430-31.  That statement is not evidence, *see supra* Part I.D.3.a, and also was made in December 2002 – when Al Hussayen *was* a government employee, having been appointed in March 2002.  ECF No. 83-

---

[35] Plaintiffs' last submission of purported evidence about Al Hussayen's supposed actions pointed solely to two newspaper articles, neither of which mentioned the supposed last-minute hotel switch.  *See* ECF No. 2948, at 5-6.  Both articles also state "there is no evidence that [Al Hussayen] met the hijackers."  Aver. Ex. 65, at 2; *see* Aver. Ex. 64, at 5.

2, ¶ 7.  It both fails to salvage Plaintiffs' insufficient showing that Al Hussayen was so employed in September 2001 and is wholly irrelevant to their failure to show that he did anything wrong.

### 5.  Mohammed Al Qudhaieen and Hamdan Al Shalawi

Plaintiffs' new allegations accusing Mohammed Al Qudhaieen and Hamdan Al Shalawi of participating in a "dry run for the 9/11 attacks," CAC ¶ 270, likewise fall short.  Their factual basis for that remarkable claim is that, during a 1999 flight on America West Airlines, Al Qudhaieen "attempted on two occasions to enter the cockpit."  *Id.* ¶ 271.  The Court should reject Plaintiffs' attempts to make a mountain out of that molehill.

### a.  No Action Within Scope of Employment or Agency.  Plaintiffs cannot plausibly

plead that Al Qudhaieen was an agent or employee of Saudi Arabia, *see* CAC ¶ 267, by alleging he was "'in frequent contact with Saudi government establishments in the United States,' was 'very involved in the affairs of the local Saudi community,' and was 'receiving money from the Saudi government.'"  *Id.* ¶ 268.  Part Four states that Al Qudhaieen was "in the United States as a student," CAC App'x 2, at 434; any money he received may simply have been financial aid.  Nor does traveling to a symposium at the Saudi embassy's expense, CAC ¶¶ 273-274, suggest he was a secret government agent.[36]

Plaintiffs' allegations about Al Shalawi fare no better.  Their statement that he was "a long time employee of the Saudi government," *id.* ¶ 272, is nakedly conclusory.  Their statement that he "was receiving a stipend from the Saudi government at the time of the incident," *id.*, is no

---

[36] Part Four's discussion of Al Qudhaieen is also candidly speculative.  *See* CAC App'x 2, at 434 (stating that the FBI "had not obtained [Al Qudhaieen's] bank records"; describing beliefs of certain FBI agents about Al Qudhaieen's links to that government as "speculat[ion]").

different from the allegation that Al Qudhaieen received unspecified funding.  Part Four does not

even speculate that Al Shalawi was an agent or employee of Saudi Arabia.[37]

      **b.**     **No Tortious Act.**  Plaintiffs also fail to show that Al Qudhaieen's alleged attempt

to open the cockpit door on the America West flight in 1999 was tortious.  They ask this Court to

infer that he and Al Shalawi were terrorist conspirators testing the security of U.S. airlines.  But

there is an "obvious alternative explanation," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567

(2007), for Al Qudhaieen's conduct:  a mistake while "looking for the lavatory on the plane."

9/11 Report 521 n.60 (reporting what Al Qudhaieen and Al Shalawi told Commission staff).

Without factual allegations to show conspiracy, Plaintiffs fail to "nudge[ ] their claims across the

line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

     Plaintiffs cannot salvage their insufficient allegations by relying on an FBI agent's

speculation, quoted in the Joint Inquiry Report, that Al Qudhaieen and Al Shalawi "were

specifically attempting to test the security procedures of America West Airlines in preparation

for and in furtherance of UBL/Al Qaeda operations."  CAC ¶ 271 (quoting CAC App'x 2, at

433-34).  This statement concerns an investigator's beliefs about a "possibl[e]" scenario that was

"currently under investigation," CAC App'x 2, at 434, and is therefore inadmissible.  *See supra*

Part I.D.3.c.  The FBI's and CIA's later finding of "no evidence that . . . the Saudi Government

. . . knowingly provided support for the attacks of 11 September 2001 or . . . had foreknowledge

of terrorist operations in the Kingdom or elsewhere," 2005 FBI-CIA Summary 2, confirms that

any investigation into Al Qudhaieen and Al Shalawi disproved such speculation.

---

[37] Equally futile are Plaintiffs' allegations that the symposium to which Al Qudhaieen and Al Shalawi were traveling was partly sponsored by "the Institute for Islamic and Arabic Sciences in America ('IIASA')," a "non-profit educational institution" whose parent was a Saudi Arabian university.  CAC ¶¶ 274, 276.  Plaintiffs allege neither that the two men were employees of IIASA nor that IIASA or its parent university was an alter ego of Saudi Arabia.

Plaintiffs' general charges that IIASA "promote[d] and spread radical Wahhabi ideology" and had "ties to terrorism," CAC ¶¶ 274-277, in addition to being conclusory, are immaterial. IIASA is not a defendant, and its views cannot be attributed to Al Qudhaieen or Al Shalawi merely because the two men attended a symposium it partially sponsored.  Plaintiffs' charge that Al Shalawi received terrorist training in Afghanistan in 2000, *id.* ¶¶ 270, 279-280, lacks evidentiary support and appears to be multiple hearsay from an unidentified source.[38]

The Court may also take notice that Al Qudhaieen and Al Shalawi remained in the United States after 9/11 and filed a civil rights action against America West.  The action failed, but the court noted that "America West [had] apologized" to the two men for reporting suspicions about them.[39]  That is hard to reconcile with Plaintiffs' attempt to depict them as terrorist conspirators.

    **c.**    **No Causation.**  Even if Plaintiffs could show that Al Qudhaieen or Al Shalawi had bad intent, there are no factual allegations or evidence tying them to the 9/11 attacks.  As explained above, Plaintiffs' conclusory allegations that the 1999 America West flight was a "dry run" for 9/11 are based on early speculation from an investigation that found no wrongdoing.

---

[38] *See* CAC App'x 2, at 433 (Joint Inquiry Report stating that "the FBI received reporting" from a redacted source that Al Shalawi had received terrorist training in Afghanistan). When interviewed by the 9/11 Commission staff, Al Shalawi denied this allegation, stating that he had been in Arizona in the fall of 2000 and "ha[d] gone to Afghanistan . . . only once in the late 1980s after the war with the Soviet Union."  9/11 Report 521 n.60.  In light of the lack of support for their allegation about Al Shalawi, Plaintiffs' further contention that "the 9/11 muscle hijackers were simultaneously receiving training" in Afghanistan, CAC ¶ 279, is irrelevant.

[39] *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp. 2d 841, 844 (S.D. Ohio 2003).  That action charged the airline with having "relayed false information based on racial stereotypes[, which] led to the unlawful harassment and detention of the plaintiffs."  *Id.*  It ultimately failed because the court ruled that the airplane captain who relayed the information to the government was entitled "to rely on the information provided to him by his crew despite any exaggerations or false representations" contained in that information.  *Id.* at 848.

6.        **Mohammed Jabar Fakihi**

Plaintiffs' allegations and evidence against Mohammed Jabar Fakihi are also insufficient. According to his interview with the 9/11 Commission staff, which Plaintiffs have incorporated into their complaint, *see* CAC ¶ 3, Fakihi was a "payroll accountant" for the Ministry of Islamic Affairs assigned to the Saudi embassy in Germany from June 2000 to March 2003.  Aver. Ex. 74, at 1.  He managed the monthly salaries of 15 employees, who received the equivalent of between $4,800 and $6,667 per month.  *See id.* at 2.  Fakihi had no discretion over payments; he "received a payment schedule from Riyadh and simply dispensed the required amounts."  *Id.*

Plaintiffs assert that Fakihi was the "head of the Islamic Affairs office at the Saudi Embassy in Berlin"; that he associated with members of an Al Qaeda cell in Hamburg, Germany, some of whom were involved in the 9/11 plot; that he "diverted extensive funds to al Qaeda from Saudi embassy accounts"; and that he "was 'organizationally involved' in bin Laden's organization."  *E.g.*, CAC ¶¶ 288-289 (citing Aver. ¶ 261).  Plaintiffs further contend that he "arranged for" a donation of funds from the charity Al Haramain to the Al Nur mosque in Berlin, which they describe as a "notorious haven for Islamic extremists."  *Id.* ¶¶ 292, 295.  Those allegations are conclusory, legally insufficient, and backed by no evidence.

a.        **No Action Within Scope of Employment or Agency.**  Plaintiffs' allegations against Fakihi focus primarily on his asserted role in obtaining funding for an expansion of the Al Nur mosque.  CAC ¶¶ 291-297.  Plaintiffs do not allege, however, that any of the mosque funds came from Saudi Arabia or its embassy.  Instead, they allege that the funds came from the charity Al Haramain.  *Id.* ¶ 295.  As explained in Part III.A.1.g, Al Haramain is a separate entity from Saudi Arabia, and Plaintiffs have failed to make the showing necessary to hold Saudi Arabia liable for Al Haramain's actions.  Further, Plaintiffs do not allege that Fakihi had

authority over Al Haramain's funds.  Rather, he is alleged to have written (but denies writing, Aver. Ex. 74, at 3) a letter to the Minister of Islamic Affairs to support the mosque expansion. CAC ¶ 293.  Even if funding the mosque were somehow a wrongful act, nothing suggests that it was an act over which Fakihi had authority or control as an employee of Saudi Arabia.

Plaintiffs also allege that Fakihi diverted funds from Saudi embassy accounts to Al Qaeda.  *Id.* ¶ 289; Aver. ¶ 261.  Any such diversion (which Fakihi has denied, Aver. Ex. 74, at 4) would have been outside the scope of his employment.  He had no authority or discretion to pay out funds except as directed by his superiors, *id.* at 2, and there is no allegation that those superiors authorized the alleged diversion.  Accordingly, Saudi Arabia would be a victim of the alleged conduct, not a participant.  *See International Bhd. of Teamsters*, 141 F.3d at 409 (acts of "embezzlement" are not within "the scope of . . . employment").

**b.    No Tortious Act.**  Plaintiffs also fail to allege that Fakihi committed any tortious act.  As to the funding of the Al Nur mosque, Plaintiffs point to nothing in the letter Fakihi allegedly wrote that suggests motives other than sincere religious belief.[40]

As for Fakihi's purported diversion of funds, Plaintiffs offer no concrete allegations in their complaint and certainly no evidence to support their claim.  The Averment relies on congressional testimony by a senior fellow from a think tank.  Aver. ¶ 261 (quoting Aver. Ex. 79).  Plaintiffs' version of that testimony states without elaboration or support that Fakihi "confessed to doling out embassy funds according to the instructions of 'close friends' of Osama

---

[40] According to Plaintiffs, the letter "propos[ed] to turn the Al Nur Mosque into a center for Islamic missionary activity aimed at 'ethnic European' populations in Eastern Europe," and "to carry the word of Islam to Poland, the Czech Republic and Hungary, the last of 'which once belonged to the Islamic Caliphate under Ottoman Empire rule.'"  Aver. ¶ 256.  It is not tortious to want to convert others to one's own religion.  Although Plaintiffs allege that others at the mosque advocated violence, CAC ¶ 292, they make no such allegations as to Fakihi.

bin Laden." Aver. Ex. 79, at 2. A fuller version of the testimony, available online, indicates that the allegation is taken from newspaper articles.[41] None of this is evidence.

Nor can Plaintiffs prevail with vague allegations that Fakihi had been in "direct contact," CAC ¶ 289, with Al Qaeda members in Hamburg.[42] The law "does not penalize mere association with a foreign terrorist organization," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (discussing 18 U.S.C. § 2339B), consistent with the longstanding principle that in civil as well as criminal cases "guilt by association is impermissible," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). Plaintiffs' assertion that unnamed U.S. officials believe that Fakihi was "organizationally involved" with Al Qaeda, CAC ¶ 289, is also insufficient as conclusory, with no facts to support that second-hand conclusion.

Plaintiffs' allegations are also unsupported by evidence. Leaving aside Fakihi's interview with 9/11 Commission staff, in which he denied wrongdoing, Aver. Ex. 74, at 4, Plaintiffs' charges against him are based directly or indirectly on newspaper and magazine articles, many citing unnamed sources. Aver. Exs. 75-79. Those articles also undermine Plaintiffs' claims: for example, one states that "Mr. Fakihi hasn't been accused of involvement with terrorism" and that German "investigators said they don't think Mr. Fakihi assisted the [9/11] hijackers." Aver. Ex. 75, at 2, 6.

    **c.**    **No Causation.** Even if Plaintiffs could show that Fakihi unlawfully diverted funds while in Berlin from 2000 to 2003 (which they cannot), and even if Saudi Arabia were

---

[41] *See* Matthew Levitt, *Subversion from Within: Saudi Funding of Islamic Extremist Groups Undermining U.S. Interests and the War on Terror from within the United States* 2 n.18 (Sept. 10, 2003), http://www.washingtoninstitute.org/policy-analysis/pdf/subversion-from-within-saudi-funding-of-islamic-extremist-groups-undermin.

[42] *See also* CAC ¶ 296 (alleging that Al Qaeda members were "seen visiting" the Al Nur mosque and that Fakihi "met with" one of them, who received his business card).

potentially liable for such an act (which it is not), Plaintiffs do not allege that any such transfer happened before the 9/11 attacks.  Even Plaintiffs' most legally permissive (and erroneous, *see supra* Part I.C) theories of causation would not enable them to argue that funds purportedly transferred to Al Qaeda after September 2001 caused attacks that happened earlier.

### 7.    Omar Abdi Mohamed

Plaintiffs' new allegations concerning Omar Abdi Mohamed, CAC ¶¶ 302-306, also fall short.  Those allegations are unrelated to JASTA's abrogation of the entire-tort rule:  Abdi Mohamed's alleged conduct occurred in the United States.  The allegations are also unrelated to any newly declassified material:  Plaintiffs rely on immigration-fraud charges that have been public since 2004.  If the Abdi Mohamed allegations were more than conclusory makeweight, Plaintiffs would have raised them earlier.

**a.    No Action Within Scope of Employment or Agency.**  Plaintiffs do not allege that Abdi Mohamed took any relevant action within the scope of his alleged employment.  They say that he "entered the United States in or around 1998 as a religious worker" and was employed by the Ministry of Islamic Affairs as a "Propagator."  CAC ¶¶ 302-303.  "[P]ropagation" generally means "the spreading of something (as a belief, ideal, practice) abroad or into new regions."  *Webster's Third New International Dictionary* 1817 (2002).  Thus, the allegation is that Abdi Mohamed was employed as a missionary to spread the Islamic faith.  None of his allegedly wrongful conduct relates to that job description.

Instead, Plaintiffs allege that Abdi Mohamed established a charity called the Western Somali Relief Agency ("WSRA") and caused funds from this charity to be transferred to another organization called Dahab Shil.  CAC ¶¶ 304-305.  Plaintiffs do not allege any facts to link either the WSRA or Dahab Shil to Abdi Mohamed's alleged employment responsibilities to propagate

- 42 -

the Islamic faith.  Instead, they merely assert that he acted "under supervision of his superiors with the Ministry of Islamic Affairs." *Id.* ¶ 304.  That purely "conclusory" assertion is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.  It is also unsupported by any evidence.

> **b.**    **No Tortious Act.**  Plaintiffs do not properly allege or come forward with evidence that Abdi Mohamed transferred funds to any terrorist organization.  Their assertion that the WSRA (which is not a defendant here) was "a front for funding al Qaeda," CAC ¶ 304, is conclusory.  Plaintiffs do not allege and cannot show that the WSRA has ever been designated or adjudicated to be a terrorist organization, much less associated with Al Qaeda.  Nor have they shown that Abdi Mohamed was ever charged with knowing or reckless support for terrorism.[43]

Plaintiffs similarly lack any basis for calling Dahab Shil (also known as "Dahabshiil") a "prominent al Qaeda front" or saying its "Pakistan office" was "under the control of 9/11 mastermind Khalid Sheikh Mohamed." *Id.* ¶ 305.  Like the WSRA, Dahabshiil is not a defendant in this case, and there is no evidence concerning it.  This Court may take notice, however, that Dahabshiil is a currently operating company that holds itself out as a legitimate provider of financial services.[44]  To show otherwise, Plaintiffs need more than their mere say-so.

---

[43] The opinion affirming Abdi Mohamed's sentence for immigration fraud made clear that the district court had not found that he "had actually committed acts jeopardizing national security" or that his conduct "had actually led to, or was intended to lead to, any harm." *United States v. Mohamed*, 203 F. App'x 879, 880 (9th Cir. 2006).  Although Mohamed's conviction did involve a finding that he was an employee of Saudi Arabia and failed to disclose that status when he should have, *see id.*, that finding does not help Plaintiffs here.

[44] *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, No. 15-CV-9623 (VEC), 2017 WL 395210, at *5-7 (S.D.N.Y. Jan. 27, 2017) (dismissing claims that Dahabshiil provided material support for terrorism, following *Terrorist Attacks VIII*); *Dahabshiil Transfer Servs. Ltd. v. Barclays Bank Plc*, [2013] EWHC 3379 (Ch), 2013 WL 5826347, ¶¶ 1, 77 (enjoining Barclays on an interim basis to continue to supply banking services to Dahabshiil); *see also id.* ¶ 27 (describing Dahabshiil as "one of the largest African MSBs," or "money service businesses," serving "individuals (especially migrant workers) and also corporate entities, international aid organisations and charities (including the United Nations Development Programme, the World Health Organisation, Oxfam, Save the Children UK and Action Aid International)").

Further, even if Plaintiffs' allegations about the Pakistan office of Dahabshiil were properly pleaded or supported by evidence (which they are not), there is no allegation or evidence that Abdi Mohamed knew those facts or sent any money to or through the Pakistan office.

**c.     No Causation.**  Plaintiffs also have neither alleged nor shown that Abdi Mohamed caused the 9/11 attacks.  As Judge Robertson put it, a theory that defendants "(i) . . . funded (ii) those who funded (iii) those who carried out the September 11th attacks" is insufficient to plead causation.  *Burnett*, 292 F. Supp. 2d at 20.  Plaintiffs' contention that Abdi Mohamed sent funds from the WSRA to or through Dahabshiil and that those funds somehow later made their way to Al Qaeda suffers from the same defect.

**B.     The *Ashton* Complaint**

The *Ashton* Complaint fares no better.  Its allegations largely focus on the same facts (or conclusory assertions) as the CAC.[45]  Rather than repeat its entire analysis as to each allegation, Saudi Arabia discusses below only those parts of the *Ashton* Complaint that attempt to say something new or different.  None is enough for the *Ashton* Plaintiffs to succeed where Plaintiffs as a group have failed.  In addition, the *Ashton* Plaintiffs have not supported their allegations with evidence.[46]  Even if the *Ashton* allegations were legally sufficient (which they are not), that would do the *Ashton* Plaintiffs no good without evidence to support those allegations.

---

[45] *Compare* CAC ¶¶ 170-178, 180, 185-189, 196, 218-249 (Al Bayoumi), *with Ashton* Compl. ¶¶ 39(i)-(k), 43(l), 44(b)-(e), 44(i), 44(q)(ii) (same); CAC ¶¶ 165-171, 191, 207-209, 213-217 (Al Thumairy), *with Ashton* Compl. ¶¶ 39(g), 44(b)-(c), 44(e)-(f), 44(q)(i); CAC ¶¶ 199-205, 252-253 (Basnan), *with Ashton* Compl. ¶¶ 44(g)-(h) (same); CAC ¶¶ 281-287 (Al Hussayen) *with Ashton* Compl. ¶¶ 44(o)(i), (q)(iv); CAC ¶¶ 270-280 (Al Qudhaieen and Al Shalawi) *with Ashton* Compl. ¶¶ 44(k)-(m) (same); CAC ¶¶ 288-298 (Fakihi) *with* Ashton Compl. ¶¶ 39(m)-(o) (same); CAC ¶¶ 302-306 (Abdi Mohamed) *with Ashton* Compl. ¶¶ 39(c)-(e) (same).

[46] Though the *Ashton* Complaint purports to quote some sources, *e.g.*, *Ashton* Compl. ¶¶ 39(o), 43(a), it does not identify or attach those sources.

### 1.    Omar Al Bayoumi

The only allegation the *Ashton* Plaintiffs add about Al Bayoumi is that he "had an indicator in his Saudi Arabia passport of ties to al Qaeda."  *Ashton* Compl. ¶¶ 15, 44(r)(v).  That allegation was rejected by the 9/11 Commission, which found that Al Bayoumi's

> passport . . . contains a cachet that intelligence investigators associate with possible adherence to al Qaeda.  It is a marking that can be obtained by especially devout Muslims.  Although we believe the marking suggests the need for further inquiry, it is not the kind of fraudulent manipulation that would conclusively link the document with a terrorist organization.

9/11 Report 516 n.19.  Any such marking was thus fully consistent with the Commission's finding of "no credible evidence that [Al Bayoumi] believed in violent extremism or knowingly aided extremist groups."  *Id.* at 218.  It is also irrelevant to Al Bayoumi's scope of employment, the basis for the Court's previous ruling rejecting Plaintiffs' allegations about him.

### 2.    Fahad Al Thumairy

The *Ashton* Complaint adds two new allegations concerning Al Thumairy.  Neither renders its claims plausible.  *First*, unlike the CAC, the *Ashton* Complaint asserts that Al Thumairy gave money to Al Qaeda.  But it makes only the vague, conclusory claim that Saudi Arabia had "employees and agents, including but not limited to Fahad al Thumairy," who gave "substantial sums of money" to Al Qaeda "through the King Fahad Mosque . . . or through various organizations, individuals and/or private businesses, including but not limited to charities and/or other businesses."  *Ashton* Compl. ¶ 39(f).  Those "threadbare [and] speculative" allegations "fail[ ] to cross the line between the conclusory and the factual."  *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013).

The *Ashton* Plaintiffs' failure to make concrete allegations or come forward with any evidence of asserted money transfers to Al Qaeda is especially significant in light of the 9/11 Commission's express findings of "no evidence that the Saudi government as an institution or

senior Saudi officials individually funded" Al Qaeda, as well as "no credible evidence that any person in the United States gave the hijackers substantial financial assistance" and "no evidence that any foreign government – or foreign government official – supplied any funding." 9/11 Report 171, 172. More is needed to reopen that issue than speculation.

*Second*, the *Ashton* Plaintiffs allege that Al Thumairy "assisted" Al Mihdhar and Al Hazmi "with transportation and housing" and "directed" others to assist similarly. *Ashton* Compl. ¶¶ 44(c), (e)-(f). Such conclusory assertions are not enough. *See supra* Part II.A.2.

### 3. Osama Basnan

The *Ashton* Complaint makes two additions to the CAC's allegations about Osama Basnan: that Basnan put Al Hazmi and Al Mihdhar "in contact with a commercial airline pilot, Khaled al-Kayed," *Ashton* Compl. ¶ 44(g), and that "Basnan or an associate had phone contacts with the members of al Qaeda's Hamburg cell and Basnan placed regular calls to members of Osama Bin Laden's family," *id.* ¶ 44(h). Even assuming the truth of those unsupported allegations, they do not amount to substantial assistance.[47] They are also irrelevant in light of Plaintiffs' complete failure to allege properly or come forward with evidence to show that Basnan was an agent or employee of Saudi Arabia. *See supra* Part II.A.C.

### 4. Saleh Al Hussayen

The *Ashton* Complaint does not contain any allegations about Saleh Al Hussayen significantly different from those in the CAC.

---

[47] In particular, the allegation that Basnan introduced Al Hazmi and Al Mihdhar to an airline pilot would founder for lack of any allegation or evidence that the pilot helped them in any way. As the 9/11 Commission explained, neither of the two learned to fly. *See* 9/11 Report 221-22 (describing the "insurmountable barrier" that they faced in "learning how to fly").

### 5.   **Mohammed Al Qudhaieen and Hamdan Al Shalawi**

The *Ashton* Complaint's only significantly different allegations regarding Al Qudhaieen and Al Shalawi are that they allegedly "met . . . hijacker Hani Hanjour" at a mosque in Arizona "from 1997-1999" – a vague allegation whose three-year time frame makes clear that the *Ashton* Plaintiffs are grasping at straws, with no specific meeting or meetings in mind – and that they met with Al Thumairy in 1998 at the King Fahd mosque in Culver City.  *Ashton* Compl. ¶ 44(m). There is no allegation of what was discussed at the purported meetings.

### 6.   **Mohammed Jabar Fakihi**

The *Ashton* Complaint's cursory allegations about Fakihi, like those of the CAC, focus on the funding of the Al Nur mosque and on the alleged diversion of embassy funds.  As to the mosque funding, the *Ashton* Plaintiffs do not dispute that the funds came from Al Haramain rather than from Saudi Arabia.  *Ashton* Compl. ¶ 39(n).  They assert that the funding was "to support al Qaeda," *id.*, but that conclusory assertion adds nothing.  Similarly, as to the alleged diversion of embassy funds, the *Ashton* Plaintiffs add an assertion that Fakihi was acting within the "scope of his job[] for Saudi Arabia," another bare conclusion that is plainly insufficient.

### 7.   **Omar Abdi Mohamed**

The only additional allegations in the *Ashton* Complaint about Abdi Mohamed are conclusory assertions that Saudi Arabia, "through" Mohamed, "fraudulently sought and obtained a visa" for him to enter the United States and "fraudulently obtained and/or maintained 26 U.S.C. § 501(c)(3) charitable status for WSRA . . . despite the fact that WSRA never performed any charitable acts."  *Ashton* Compl. ¶¶ 39(c)-(d).  Neither purported act falls within the properly alleged scope of any employment or agency.  Neither is properly alleged to have caused Plaintiffs' injuries.

## III.    Plaintiffs Cannot Plead or Prove a Basis for Jurisdiction Based on the Acts of Any Charity

### A.    The Consolidated Amended Complaint

Plaintiffs have provided no basis for asserting jurisdiction over Saudi Arabia based on the alleged actions of various governmental and nongovernmental organizations – to which they often refer as "da'awa organizations," although the CAC is in English and the ordinary English word "charities" is perfectly suitable.[48]  Plaintiffs attempt to plead and prove jurisdiction based on the actions of seven charities.  Those charities are:

- the **Saudi High Commission for Relief of Bosnia & Herzegovina** ("SHC"), a charitable instrumentality of Saudi Arabia and a Defendant in this case;

- the **Saudi Joint Relief Committee for Kosovo** ("SJRC") and the **Saudi Red Crescent** ("Red Crescent"), two other charitable instrumentalities of Saudi Arabia, dismissed from this litigation in 2013;

- the **Muslim World League** ("MWL"), the **International Islamic Relief Organization** ("IIRO"), and the **World Assembly of Muslim Youth** ("WAMY"), three nongovernmental charitable organizations currently in discovery; and

- the **Al Haramain Islamic Foundation** ("Al Haramain"), a nongovernmental charitable organization whose Saudi and U.S. branches are each subject to a default judgment.

Plaintiffs assert three theories for attributing those charities' alleged conduct to Saudi Arabia: the charities (1) are "alter-egos" of Saudi Arabia, (2) are "agents" of Saudi Arabia, and (3) "perform core functions of the Saudi state."  CAC ¶ 105.  None of those theories has merit.

---

[48] "Dawah," literally "[c]all," can be translated as referring to "God's way of bringing believers to faith and the means by which prophets call individuals and communities back to God."  *The Oxford Dictionary of Islam* 64 (John L. Esposito ed., 2003).  To the extent Plaintiffs imply the charities perform solely religious functions, they are wrong; the charities also provide humanitarian aid.  *See, e.g.*, Aver. Ex. 223, ¶ 12 (declaration of SHC officer describing its "relief for refugees and orphans" in connection with the Bosnian civil war; "assistance . . . to orphans, widows, and poor families"; and "the construction and repair of schools, homes, medical centers, and mosques, hundreds of which were destroyed during the war").

### 1.     The Charities Are Not Alter Egos of Saudi Arabia

To establish that a separate legal entity is an "alter ego" of a foreign sovereign requires a

showing of "day-to-day" control.  Multiple Second Circuit decisions have described the standard,

which derives from *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462

U.S. 611 (1983) ("*Bancec*").  As the Second Circuit recently explained, the FSIA incorporates "a

statutory 'presumption that a foreign government's determination that its instrumentality is to be

accorded separate legal status' will be honored."  *EM Ltd. v. Banco Central de la Republica*

*Argentina*, 800 F.3d 78, 90 & n.53 (2d Cir. 2015) (quoting *Bancec*, 462 U.S. at 628), *cert.*

*dismissed*, 136 S. Ct. 1731 (2016).  "Sound justifications support this principle, known as the

'*Bancec* presumption.'"  *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201 (2d Cir.

2016).  Those justifications include respect for "'the efforts of sovereign nations to structure

their governmental activities in a manner deemed necessary to promote economic development

and efficient administration'" and a desire to encourage foreign nations to recognize the

"'juridical divisions'" created by U.S. law.  *EM Ltd.*, 800 F.3d at 90 & nn.50, 52 (quoting

*Bancec*, 462 U.S. at 626, 628).

To prevail here, Plaintiffs must "shoulder the burden of rebutting the *Bancec*

presumption."  *Arch Trading*, 839 F.3d at 200.  The presumption is "'strong'" and "difficult to

overcome."  *Id.* at 201, 207 (quoting *Zappia*, 215 F.3d at 252).  To do so, a plaintiff must show

either that a sovereign exercises "extensive control" over its instrumentality or that recognizing

the instrumentality "as a separate entity would work a 'fraud or injustice'" by enabling an

"'abuse[ ] of [the] corporate form.'"  *EM Ltd.*, 800 F.3d at 95.  Plaintiffs have never contended

that they can meet the fraud-or-injustice test, so the control test is the only one at issue.

The control test requires "significant and repeated control" by the sovereign "over the

instrumentality's day-to-day operations."  *Id.* at 91.  In applying that test, courts take into

account that "[g]overnments commonly exercise some measure of control over their instrumentalities." *Id.* at 93. To defeat the presumption of separateness, a plaintiff must show a "complete takeover of [the instrumentality's] day-to-day operations" by the sovereign. *Id.* at 95. The same test also applies where, as here, "other distinct legal entities that may not themselves be entitled to sovereign immunity" are asserted to be alter egos of a sovereign or its instrumentality. *Arch Trading*, 839 F.3d at 201; *see also Zappia*, 215 F.3d at 252.

Applying *Bancec* and *EM Ltd.* in September 2015, this Court determined that Plaintiffs had no allegations sufficient to "show that Saudi Arabia controlled the day-to-day operations of these charities." *Terrorist Attacks IX*, 134 F. Supp. 3d at 783. It also considered and rejected the testimony of their expert, Evan Francois Kohlmann, as "[in]sufficient for this Court to even reasonably infer that Saudi Arabia controls each of the charities at issue" because of its "conclusory, largely boilerplate, allegations." *Id.* at 784 n.9. The Solicitor General reached the same conclusion in a brief filed for the United States in the Supreme Court in 2009:

> Especially in light of the law's respect for corporate personality, which the FSIA recognizes, the complaint's formulaic recitation of incidents of control by Saudi Arabia – repeated verbatim with respect to eight charities – provides an insufficient basis for deeming the acts of the charities to be those of Saudi Arabia.

U.S. Amicus Br. 17 n.4 (citations omitted); *see Terrorist Attacks IX*, 134 F. Supp. 3d at 783.

The CAC does not change that result. The core of its pleading on this issue is a single, four-and-a-half-page paragraph, with 43 subparagraphs, purporting to collect "facts" showing Saudi Arabia's "complete domination" of all of the charities. CAC ¶ 131. The assertions in the omnibus, boilerplate paragraph are recycled from the prior pleading this Court rejected. They are also facially inadequate under Second Circuit precedent. According to Plaintiffs, the charities were "established by royal decree," *id.* ¶ 131(a); they receive government financial support and other assistance, *id.* ¶¶ 131(b)-(c), (p), (t), (w), (z), (dd), (ff)-(gg); the government appoints and

removes their directors and officers, and some government officials serve in those positions, *id.* ¶¶ 131(d)-(e), (l), (n), (r)-(s), (x), (ee); the government provides guidance to the charities and monitors the charities' activities, *id.* ¶¶ 131(h), (j)-(k), (m)-(o), (q)-(r), (u), (y), (aa)-(bb); the charities provide the government with reports on their activities and occasionally seek its approval, *id.* ¶¶ 131(f)-(g), (i), (cc); and some have claimed sovereign status, *id.* ¶¶ 131(v), (x).

None of those assertions justifies alter-ego status. The Second Circuit in *EM Ltd.* rejected arguments that a plaintiff can establish alter-ego status by showing that the sovereign "hir[es] and fir[es] . . . board members or officers" of the instrumentality, 800 F.3d at 92-93; sets "goals and policies" for the instrumentality to follow, *id.* at 93; and "consult[s] and coordinate[s] . . . actions" with the instrumentality, *id.* at 94. The Second Circuit has also held that alter-ego status cannot be shown with evidence that the sovereign "created" the entity and "directed the removal" of board members, or that a country's Ambassador to the United Nations played a "supervisory role" over the entity. *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 130 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1332 (2017). And the Second Circuit has explained that "nonspecific 'oversight' " does not satisfy the *Bancec* standard. *Arch Trading*, 839 F.3d at 204.

Assertions of government funding and other support similarly do not show the requisite day-to-day control. In *NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ. 7013(TPG), 2011 WL 524433 (S.D.N.Y. Feb. 15, 2011), the court held that a government-owned energy company was not the government's alter ego even though the plaintiff alleged that the company relied "entirely on the Republic for funding." *Id.* at *3; *see Transamerica Leasing, Inc. v. La*

*Republica de Venezuela*, 200 F.3d 843, 852 (D.C. Cir. 2000) (government funding "not an instance of 'day-to-day' involvement in the affairs of the corporation").[49]

Even in a purely legal inquiry concerning the sufficiency of the plaintiffs' allegations, assertions such as those in Plaintiffs' latest pleading fall short.  *See EM Ltd.*, 800 F.3d at 95. Here, where Plaintiffs have the burden of going forward with evidence, they must not only allege day-to-day control but also come forward with evidence of and ultimately prove such control. *See Arch Trading*, 839 F.3d at 199-200 ("Although the foreign sovereign shoulders the burden of persuasion on the ultimate question of subject matter jurisdiction, those suing the sovereign shoulder the burden of rebutting the *Bancec* presumption of legal separateness when that presumption is at issue.") (citations omitted).  Plaintiffs have not done so, even after years of discovery from many of the alleged alter-ego charities.

a. **The SHC.**  Plaintiffs' allegations that the SHC was an alter ego of Saudi Arabia refer to two declarations filed in support of the SHC's original motion to dismiss.  CAC ¶ 124; Aver. ¶¶ 521-522.[50]  Those show the SHC's status as a "governmental entity" separate from Saudi Arabia, Aver. Ex. 1, ¶ 4, formed to promote Saudi Arabian foreign policy towards Bosnia and Herzegovina, *id.* ¶ 5; Aver. Ex. 223, ¶¶ 20-21, by distributing charitable donations from public and private sources, Aver. Ex. 223, ¶¶ 24-25.  Discretionary decisions about funding were made by the SHC's Executive Committee, Aver. Ex. 1, ¶ 9, headed by a government official but

---

[49] It is likewise irrelevant that the charities' main offices in Saudi Arabia supervise their branch offices in other countries.  *See* CAC ¶¶ 131(hh)-(qq).  The question at issue is whether Saudi Arabia exercises extensive control over the charities' day-to-day operations, not whether the charities' main offices control their branch offices.

[50] Those declarations were submitted by Dr. Mutlib bin Abdullah Al-Nafissa, Aver. Ex. 1, and Saud bin Mohammad Al-Roshood, Aver. Ex. 223.

including private members, Aver. Ex. 223, ¶ 8.  Neither declaration suggests that Saudi Arabia exercised day-to-day control over the SHC's distribution of funds or any of its other activities.

Plaintiffs quote out of context a statement from one declaration that "[a]ctions taken by the [SHC] may be viewed as actions of the government of Saudi Arabia."  Aver. Ex. 1, ¶ 3, *quoted in* CAC ¶ 124.  In context, this clearly meant that the SHC was a "governmental entity," *id.* ¶ 4, not that it was an alter ego of Saudi Arabia, *see id.* ¶ 8 (noting that the SHC "can be sued for [its] administrative acts in the Board of Grievances, the administrative court of Saudi Arabia"); *see also* Aver. Ex. 223, ¶ 10 (SHC has its own staff and its own budget).

Plaintiffs again seek to incorporate by reference the February 2015 affirmation from self-styled "International Terrorism Consultant" Kohlmann.  CAC ¶ 130; Kohlmann Affirm. ¶ 2. Kohlmann's asserted field of expertise is "terrorism issues."  Kohlmann Affirm. ¶ 6.  He does not claim to be an expert on Saudi Arabia's law, its administrative procedure, or its governmental or nongovernmental organizations.  In addition, his affirmation consists almost entirely of quotations from hearsay sources accompanied by conclusory assertions.  Courts in this Circuit disapprove of "'call[ing] an expert simply as a conduit for introducing hearsay.'"  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013).  Thus, an expert may not "simply 'repeat[ ] hearsay evidence without applying any expertise whatsoever.'"  *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).  Courts have excluded Kohlmann's testimony for this reason.[51]

This Court previously rejected Kohlmann's proffered testimony as "largely boilerplate." *Terrorist Attacks IX*, 134 F. Supp. 3d at 784 n.9.  That ruling was correct.  As to the SHC,

---

[51] *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 446 (E.D.N.Y. 2013) (excluding parts of Kohlmann's report that were "nothing more than a recitation of secondary evidence" as to which he "ma[de] no attempt to bring his expertise to bear"); *United States v. Amawi*, 541 F. Supp. 2d 945, 955 (N.D. Ohio 2008) (excluding his testimony about terrorist recruitment materials because the jury could "view [any admissible] materials" for itself), *aff'd*, 695 F.3d 457 (6th Cir. 2012).

Kohlmann merely quotes from the same declarations as does the Averment.  Kohlmann Affirm. ¶¶ 116-121.  As set forth above, those declarations do not establish day-to-day control. Kohlmann (who does not address that governing standard) does not suggest otherwise.

      **b.**     **The SJRC.**  Plaintiffs' allegations that the already-dismissed SJRC was an alter ego of Saudi Arabia are similarly bare.  CAC ¶ 127; Aver. ¶¶ 559-560.  They rely on a declaration from the SJRC's former president stating that the SJRC "'functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia.'"  CAC ¶ 127; Aver. ¶ 560.  That is not a concession of alter-ego status.  The same declaration states that the SJRC, like the SHC, was a "charitable and humanitarian entity" created by Saudi Arabia "to collect and distribute aid to Albanian refugees in Kosovo," ECF No. 631-3, ¶ 4; that the SJRC was supervised by government officials but also included private representation, *id.* ¶ 7; and that it maintained its own staff as well as using seconded Saudi Arabian civil servants, *id.* ¶ 9.  Kohlmann adds nothing of substance. *See* Kohlmann Affirm. ¶¶ 122-129.

      **c**.     **The Red Crescent.**  The analysis for the already-dismissed Red Crescent is essentially the same.  *See* CAC ¶¶ 126, 131(e) (conclusory assertions and references to declaration); Aver. ¶¶ 544-545 (same); ECF No. 96-3, ¶ 4 (declaration of Red Crescent's President stating that Saudi Arabia "sponsors and supervises the . . . Red Crescent, and appoints its directors," as well as "fund[s]" its "operations within Saudi Arabia," but not indicating day-to-day control; describing the Red Crescent as "a Saudi Government instrumentality").  Kohlmann, aside from quoting the same declaration, states that the Red Crescent is one of a number of "public corporations whose budgets are annexed to the Saudi national budget."  Kohlmann Affirm. ¶ 115.  That observation underscores that the Red Crescent is a separate entity with its own finances.

      **d.**     **The MWL.**  The MWL and the other remaining charities are differently situated from the SHC, the SJRC, and the Red Crescent:  they are nongovernmental organizations.  As a

result, none has been entitled to foreign sovereign immunity.[52]  Plaintiffs have not shown day-to-day control of these nongovernmental organizations by Saudi Arabia.

Leaving aside bare conclusions, Aver. ¶ 334, the specific facts that Plaintiffs have alleged are that Saudi Arabia supposedly founded the MWL as a service organization, *id.* ¶ 339; nominates or appoints its leadership, CAC ¶ 131(e); Aver. ¶¶ 336-338; and funds and supports its operations, CAC ¶¶ 122-123, 131(dd); Aver. ¶¶ 336, 338-340.  None of that points to alter-ego status.  *See EM Ltd.*, 800 F.3d at 92-93; *NML Capital*, 2011 WL 524433, at *3.  To the extent Kohlmann adds anything, he focuses not on control of MWL by Saudi Arabia, but on control of its branch offices by its own central office, Kohlmann Affirm. ¶¶ 65-68, which is irrelevant.

e.     **The IIRO.**  Plaintiffs' assertions that Saudi Arabia controlled the IIRO are largely conclusory and mainly rest on the premise that the IIRO is a "subsidiary" of the MWL.  CAC ¶ 122; Aver. ¶¶ 371-374.  As Plaintiffs have failed to allege day-to-day control of the MWL, it follows that they have failed to allege day-to-day control of its subsidiary.  Plaintiffs' further assertions that IIRO branch offices were instructed in 1996 to "cooperate and coordinate" with local Saudi embassies (CAC ¶ 131(y)) and that the opening of IIRO offices is "subject to the approval of the Ministry of Foreign Affairs" (*id.* ¶ 131(aa)) likewise do not suggest day-to-day control.  *See EM Ltd.*, 800 F.3d at 94 ("consult[ation]" and "coordinat[ion]" are "simply not sufficient to establish 'extensive control' ").

Kohlmann's discussion of the IIRO similarly discusses its relationship with the MWL. Kohlmann Affirm. ¶¶ 69-70.  He also quotes statements about funding the IIRO allegedly received from Saudi Arabia and from members of the Saudi Arabian royal family, *id.* ¶¶ 76-80,

---

[52] The MWL and the IIRO earlier in the litigation attempted to assert governmental instrumentality status and foreign sovereign immunity, ECF No. 346, at 66; ECF No. 1548, at 66, but neither ever moved to dismiss on that basis.

and discusses control of its branch offices by its headquarters, *id*. ¶¶ 81-90.  Even if Kohlmann's

recitation of hearsay sources were evidence (which it is not), none of the sources he cites shows

that the government of Saudi Arabia exercised day-to-day control over the IIRO's operations.

Plaintiffs quote testimony from one Canadian MWL or IIRO employee who stated the

IIRO was "controlled in . . . [its] activities and plans" by Saudi Arabia.  CAC ¶ 122; Aver. ¶ 340;

Kohlmann Affirm. ¶ 73.  Read in context, this statement refers to control at a policy level, not

day-to-day control.  *See* CAC ¶ 122 ("The [IIRO] office, like any other office in the world, here

or in the [MWL], has to abide by the policy of the Government of Saudi Arabia.") (first

alteration in original).  Control of "policies and goals" does not create an alter-ego relationship.

*EM Ltd*., 800 F.3d at 94.[53]

**f.     WAMY.**  As with the MWL and the IIRO, Plaintiffs' allegations about Saudi

Arabia's purported control of WAMY are largely conclusory.  Aver. ¶¶ 440-443.  The few

specifics Plaintiffs offer go to matters that are insufficient under *EM Ltd.* and *Bancec*.[54]

Kohlmann's discussion of WAMY largely recites immaterial allegations that WAMY's

leaders include Saudi Arabian government officials, Kohlmann Affirm. ¶¶ 93, 96; that Saudi

Arabia has funded and supported WAMY, *id*. ¶¶ 94-96, 100-103; and that WAMY's branch

offices are supervised by or "intertwined" with its own headquarters in Saudi Arabia, *id*. ¶¶ 104-

109.  Although he asserts "involvement of Saudi government officials in the day-to-day

---

[53] Kohlmann also quotes hearsay statements by Guantanamo detainees that the IIRO is a
Saudi governmental organization.  Kohlmann Affirm. ¶¶ 74-75.  Those statements are
inadmissible and irrelevant; at most, they would suggest (incorrectly) that the IIRO was an
instrumentality like the SHC, the SJRC, and the Red Crescent, not an alter ego of Saudi Arabia.

[54] *See* CAC ¶¶ 125, 131(dd)-(ee) (conclusory allegations of supervision, funding, support,
and appointment of leadership); Aver. ¶¶ 440-441 (same); *id.* ¶ 442 (conclusory allegations of
"direct[ion]" and "close[ ] supervis[ion]," plus testimony that Saudi Arabia "protect[s]" WAMY
and offers it "financial support"); *id.* ¶ 443 (control of branch offices by central leadership and
conclusory assertion of "close relationship with [Saudi Arabia's] government").

administrative aspects of WAMY's operations," *id.* ¶¶ 98-99, he offers no meaningful support.
He instead describes financial assistance from Saudi Arabia to WAMY and the involvement
of government officials in resolving a single dispute among WAMY personnel.  Even if true,
those facts permit no inference that Saudi Arabia exercised "significant and repeated control"
over WAMY's "day-to-day operations."  *EM Ltd.*, 800 F.3d at 91.

      **g.**    **Al Haramain.**  Plaintiffs' allegations about Saudi Arabia's purported control of
Al Haramain are insufficient for the same reasons as those about other nongovernmental
charities.  *See* CAC ¶¶ 121, 131(e) (conclusory assertions of control; generalized testimony about
supervision, funding, and appointment of leadership); Aver. ¶¶ 477-478 (same).  The Averment
(at ¶ 479) cites the Terrorist Financing Monograph, but the Monograph makes clear (at 114) that
Al Haramain is a "nonprofit organization" and does not suggest it is an alter ego of Saudi Arabia.
To the contrary, it describes (at 12) law-enforcement efforts directed at Al Haramain as an
"important story about U.S.-Saudi cooperation on terrorist financing in the post 9/11 period," and
shows that the United States was urging Saudi Arabia to exert *more* control over Al Haramain
after the 9/11 attacks, *see id.* at 114, 117-19 – which would make no sense if (as Plaintiffs say)
Al Haramain was wholly controlled by Saudi Arabia all along.

      Kohlmann adds no relevant substance.  Kohlmann Affirm. ¶¶ 26-54.  Most of his
discussion asserts that Al Haramain's operations were controlled not by Saudi Arabia, but by its
director Aqeel Al Aqeel, who is not a government official.  *Id.* ¶¶ 39-54.  Kohlmann's
contentions about Saudi Arabia's connection to Al Haramain concern " 'supervision,' "
"influence," and " 'cooperation,' " *e.g.*, *id.* ¶¶ 28, 30, 31, as well as appointment of officers and
funding, *id.* ¶¶ 28-29, 35, which are not enough.  Kohlmann also quotes hearsay statements by
two Guantanamo detainees that Al Haramain was a Saudi governmental organization.  *Id.* ¶ 38.
Those statements are incorrect, inadmissible, and irrelevant.  *See supra* note 53.

h.      **Other Entities.**  Plaintiffs lump Al Haramain al Masjed al Aqsa, Benevolence International Foundation, and Rabita Trust together with the entities discussed above when listing purported alter egos of Saudi Arabia.  CAC ¶¶ 31, 109, 116.  But Plaintiffs make no allegations of control specific to Al Haramain al Masjed al Aqsa or Benevolence International Foundation, and their assertions of control with respect to Rabita Trust are entirely conclusory.  Aver. ¶ 576.  Kohlmann says nothing about any of the three entities.

In sum, Plaintiffs have provided nothing to alter this Court's prior refusal to accept their boilerplate allegations and Kohlmann's collection of hearsay, especially in light of the stringent standard for alter-ego status established by *Bancec*, *EM Ltd.*, and *Arch Trading*.

## 2.      The Charities Are Not Agents of Saudi Arabia

Plaintiffs' allegations that the charities are "agents" of Saudi Arabia, CAC ¶ 105, does not change the analysis.  The *Bancec* test already asks whether a foreign entity "is so extensively controlled by its owner that a relationship of principal and agent is created" and "one may be held liable for the actions of the other."  462 U.S. at 629.  Likewise, the Second Circuit's recent decisions reinforce the point that determining whether a foreign instrumentality or other entity is an agent of a foreign sovereign is part of – not distinct from – determining whether the two are alter egos.[55]  Agency allegations therefore do not alter the requirement of day-to-day control.

JASTA does not call for any different approach.  That statute's new exemption to foreign sovereign immunity permits a foreign sovereign to be sued for the actions of an "agent" as well

_____

[55] *See EM Ltd.*, 800 F.3d at 90 ("the [*Bancec*] presumption [of separateness] may be overcome and an alter-ego relationship established if . . . the instrumentality 'is so extensively controlled by its owner that a relationship of principal and agent is created'") (quoting *Bancec*, 462 U.S. at 629); *see also Kirschenbaum*, 830 F.3d at 128 (same); *Arch Trading*, 839 F.3d at 201 (same).  As the Ninth Circuit put it in *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) (per curiam), the mere "use of the word 'agent' " is not enough to "alleg[e] the type of day-to-day control that *Bancec* . . . require[s] to overcome the presumption of separate juridical status."  *Id.* at 1080.

as for those of an "official" or "employee."  28 U.S.C. § 1605B(b)(2).  In some situations, the

extra word "agent" may authorize jurisdiction based on conduct committed by individuals other

than officials or employees (though on the present record that makes no difference, as set forth in

Part II).  As applied to instrumentalities and other entities, pre-JASTA cases such as *Bancec* and

*EM Ltd.* already recognized liability on the basis of a principal-agent relationship – but only

where there is day-to-day control, which Plaintiffs have failed to establish here.

### 3. The Charities Are Not an Integral Part of the Government of Saudi Arabia

Plaintiffs' assertion that the charities "perform core functions of the Saudi state," CAC

¶ 105, likewise provides no basis for jurisdiction.  Plaintiffs rely on *Garb v. Republic of Poland*,

440 F.3d 579 (2d Cir. 2006), but that case does not help them.  *Garb* concerned whether

Poland's Ministry of the Treasury was "an agency or instrumentality of" Poland or part of

Poland itself.  *See id.* at 589-90.  That mattered in *Garb* because, to establish jurisdiction under

the FSIA's exception for takings claims, the plaintiff had to show that the property at issue was

"owned or operated by an agency or instrumentality of the foreign state" that is "engaged in a

commercial activity in the United States."  28 U.S.C. § 1605(a)(3); *see Garb*, 440 F.3d at 589.

*Garb* held that the Ministry of the Treasury was part of Poland itself, so that the takings

exception did not apply.  *See* 440 F.3d at 598.  The Second Circuit reasoned that "the Ministry

. . . is an integral part of Poland's political structure and that [its] core function . . . is indisputably

governmental rather than commercial."  *Id.* at 595 (last alteration in original).  The court

observed that, "apart from the departments of government charged with national defense and

public order, *no* department of government is more essential to the daily functioning and long-

term survival of that government than its treasury."  *Id.* at 595 n.19.  It also relied on evidence

that, under Polish law, the Ministry of the Treasury "is part of the central government of Poland" and "does not hold property separately from the Polish State." *Id.* at 595.[56]

*Garb*'s reasoning is inapplicable here.  None of the charities, governmental or otherwise, is a ministry.  Nor have Plaintiffs ever disputed that the charities are separate entities under Saudi Arabian law.  Instead, Plaintiffs have admitted that the charities are "agenc[ies], instrumentalit[ies] and organ[s] of the Kingdom of Saudi Arabia,"[57] adopting defined statutory terms that refer only to entities separate from a foreign state.[58]  Neither *Garb* nor any other case that Plaintiffs cite supports their attempt to bypass *Bancec* through the impossibly overbroad argument that, because supporting Islam is a core function of the Kingdom of Saudi Arabia, every Saudi Arabian organization that supports Islam is legally indistinguishable from its sovereign.

### 4.    Plaintiffs Can Neither Plead nor Prove Any Tortious Act by Unnamed Officials or the Ministry of Islamic Affairs

**a.    Unnamed Officials.**  Plaintiffs likewise provide no support for their conclusory assertion that unnamed "Saudi officials" committed "tortious acts" by "direct[ing]" the charities' supposed "support of al Qaeda."  CAC ¶ 135.  Plaintiffs fail to identify any "Saudi official" who

---

[56] *See also Servaas Inc. v. Republic of Iraq*, 653 F. App'x 22, 25 (2d Cir. 2011) (Ministry of Industry is part of Republic of Iran); *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715(TPG), 2009 WL 755231, at *11 (S.D.N.Y. Mar. 12, 2009) (administrator of Argentina's public pension system is part of Republic of Argentina), *rev'd on other grounds*, 584 F.3d 120, 131 (2d Cir. 2009) (reversing judgment without reaching district court's conclusion that administrator is not "separate from the Republic for purposes of the [FSIA]").

[57] *See Fed. Ins.* Compl. ¶ 114 (MWL); *id.* ¶ 131 (IIRO); *id.* ¶ 151 (WAMY); *id.* ¶ 168 (Al Haramain); *id.* ¶ 181 (SHC); *id.* ¶ 191 (Red Crescent); *see also id.* ¶ 203 (SJRC is "compris[ed]" of Red Crescent, IIRO, WAMY, and Al Haramain, among others); CAC ¶ 21 n.4 (incorporating the *Federal Insurance* Complaint by reference).  To be clear, Saudi Arabia does not admit that the nongovernmental charities are its agencies, instrumentalities, or organs.  But Plaintiffs' allegations are nevertheless significant concessions that those charities are separate entities.

[58] The phrase "agency or instrumentality of a foreign state" is defined by the FSIA to refer to an "entity . . . which is a separate legal person, corporate or otherwise."  28 U.S.C. § 1603(b)(1).  An "organ" is one kind of agency or instrumentality.  *See id.* § 1603(b)(2).

supposedly supported Al Qaeda in this way.  *Id.* ¶¶ 134-139.  Nor do they plausibly allege that any such unnamed official was acting on behalf of the government, rather than as an official or employee of the particular charity.  Plaintiffs' further allegation that unnamed government employees working for charities were issued "diplomatic passports," *id.* ¶ 138, would – even if established through evidence – fail to show alter-ego status, *see supra* Part III.A.1, or that any such individual was acting on behalf of Saudi Arabia with respect to any particular action.

>    **b.**    **The Ministry of Islamic Affairs.**  Likewise unsupported is Plaintiffs' assertion that Saudi Arabia's Ministry of Islamic Affairs funded Al Qaeda.  CAC ¶¶ 140-154.  Plaintiffs allege that, "in or around 1998," there were "FBI[] . . . investigations indicat[ing]" that "some . . . funding" that had "originated from Saudi Arabia" was transferred "from the Somali community in San Diego to fronts associated with Osama bin Laden" after being "laundered through mosques and Islamic centers under the control and influence of the Ministry of Islamic affairs."  *Id.* ¶ 145.[59]  Key parts of that assertion are conclusory, including the contention of "launder[ing]," the contention of "control," and the contention that the otherwise unspecified destinations of the funds were "fronts associated with" Bin Laden.  None of those claims is "entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.

>    Plaintiffs' conclusory assertions also lack evidentiary support.  Like many of their allegations directed at individuals, their allegations here tie back to the recently declassified Part Four of the Joint Inquiry Report.  CAC App'x 2, at 435.  But Part Four (1) says nothing to support Plaintiffs' assertion that the Ministry exercised "control" over the mosques and Islamic centers allegedly engaged in money laundering; (2) contains no facts showing that any funds

---

[59] Although Plaintiffs assert that there were "millions of dollars in transfers" overall, there is no allegation that any particular amount went through the unnamed "mosques and Islamic centers" – all Plaintiffs purport to be able to say is that "some" did.  CAC ¶ 145.

came from the Saudi government, as opposed to nongovernmental sources; and (3) is openly speculative. *See id.* (attributing to a "former FBI agent" the view that "possible" money laundering "may" have reflected governmental support for Al Qaeda, which the agent called a "'guess'"). That second-hand speculation is not evidence.

      **c.**    **Umm Al Qura.**  Plaintiffs also cite a passage from Part Four suggesting that Saudi Arabian embassies funded the Umm Al Qura Islamic Charitable Foundation ("Umm Al Qura"), described as a "non-governmental organization linked to terrorist support activities." CAC App'x 2, at 435 (cited in CAC ¶ 146).  Umm Al Qura is not a Defendant.  Plaintiffs do not (and have no basis to) contend that it was an alter ego of Saudi Arabia.  Although the CAC asserts that Umm Al Qura is "affiliated" with "al Qaeda," Plaintiffs cite no evidence supporting that assertion.  CAC ¶ 146.  There is also no allegation that any such affiliation was known to Saudi Arabia.  Finally, the alleged funding was after September 2001.  CAC App'x 2, at 435.[60]

      **d.**    **Moussaoui.**  Plaintiffs also cite a witness statement from Zacarias Moussaoui, a convicted terrorist serving a life sentence in federal prison.  CAC ¶ 149.  This Court previously rejected Moussaoui's statement as immaterial.  *See Terrorist Attacks IX*, 134 F. Supp. 3d at 787 n.13.  The Court thus did not need to consider his massive credibility problems, including past

---

[60] Plaintiffs also refer to an allegation that, in 1999, Mullah Omar, the former leader of the Taliban, instructed the Afghan embassy in Pakistan to distribute "$2 million from Saudi aids" to a Bin Laden associate.  CAC ¶ 148.  As Plaintiffs' counsel admitted when this allegation was first publicized in 2003, the document referenced in the allegation is "cryptic" and could as easily refer to nongovernmental as to governmental aid.  *See* Michael Isikoff, *Terror Watch: The Saudi-Al Qaeda Connection*, Newsweek, Sept. 9, 2003 ("Motley concedes he doesn't know whether [the phrase "Saudi aids"] refers to funds that came from the Saudi government, Islamic charities based in Saudi Arabia or some other Saudi-based source."), http://www.newsweek.com/terror-watch-saudi-al-qaeda-connection-136275.  There is also no allegation that the purported Saudi donors (whoever they might have been) knew of or intended the diversion of the funds.

testimony that he considered it "okay to lie in court as part of jihad" and evidence that he suffers from "paranoia," "thought disorder," and "persecutory and grandiose delusions."[61]

Moussaoui's statement says that Bin Laden, building his organization in Afghanistan in the late 1990s, acted "with the express advice and consent and directive of the [Saudi] ulema." ECF No. 2927-5, at 14:5-6. But the statement provides no particularized information about any such "directive"; does not link any supposed "directive" to the 9/11 attacks, of which Moussaoui has no personal knowledge[62]; and provides no basis for inferring that any "advice" or "consent" or "directive" was given on behalf of Saudi Arabia. His statements thus do not provide "a legal basis to strip Defendants of the immunity to which they are presumptively entitled." *Terrorist Attacks IX*, 134 F. Supp. 3d at 787 n.13.[63]

### 5.      No Act of Any of the Charities Caused the 9/11 Attacks

Even if Plaintiffs could show that one or more charities committed some tortious act attributable to Saudi Arabia (which they cannot), they still could not prove that any such act caused the 9/11 attacks. Plaintiffs' allegations of causation are based on boilerplate, conclusory

---

[61] Trial Tr. 2382:19-24, *United States v. Moussaoui*, No. 1:01-cr-455, ECF No. 1755 (E.D. Va. Mar. 27, 2006) ("*Moussaoui*"); Addendum to Evaluation of Adjudicative Competence 1-2, attached as Exh. C to Standby Counsel's Memorandum Regarding Rule 11 Considerations, *Moussaoui*, ECF No. 356 (E.D. Va. filed July 24, 2002) (originally filed under seal).

[62] Mousassoui once pleaded guilty to conspiring to commit the 9/11 attacks, but later submitted a sworn statement that this was a "complete fabrication" and that he had no involvement in them whatsoever. Aff. of Zacarias Moussaoui ¶¶ 13-15, attached to Def.'s Mot. To Withdraw Guilty Plea, *Moussaoui*, ECF No. 1857 (E.D. Va. filed May 8, 2006).

[63] Plaintiffs also assert that "Saudi government clerics" recruited for Al Qaeda, including recruiting "certain of the 9/11 hijackers." CAC ¶¶ 150-151. But Plaintiffs allege no facts and provide no evidence that some unnamed clerics were acting on behalf of Saudi Arabia in allegedly recruiting 9/11 hijackers. They claim without citation that the 9/11 Commission's investigation "confirmed" their claim. *Id.* The Commission did no such thing. Plaintiffs' assertion is also inconsistent with the 2005 joint finding by the FBI and the CIA of "no evidence that . . . the Saudi Government . . . knowingly provided support for the attacks of 11 September 2001 or . . . had foreknowledge of terrorist operations in the Kingdom or elsewhere." 2005 FBI-CIA Summary 2.

assertions that "the support provided by the Kingdom enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th attacks, and was essential to the success of those attacks." CAC ¶ 52; *see also* Aver. ¶ 14. Those grandiose conclusions far exaggerate the import of Plaintiffs' threadbare allegations and nonexistent evidence. The Second Circuit has warned against allowing "conclusory . . . allegations . . . to sustain jurisdiction" because doing so "would invite plaintiffs to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct in their complaints." *Robinson*, 269 F.3d at 146. That warning applies with full force here.

Even if Plaintiffs could allege that funding went indirectly from Saudi Arabia to Al Qaeda through charitable organizations (which they cannot and have not), they would still fall short. As set forth in Part I.C.2, the Second Circuit's decisions in *Rothstein* and *Terrorist Attacks VI* provide added support for Judge Robertson's persuasive reasoning in *Burnett* that the FSIA does not permit claims against a sovereign defendant based on allegations that it "(i) . . . funded (ii) those who funded (iii) those who carried out the September 11th attacks." 292 F. Supp. 2d at 20. JASTA has done nothing to change that standard.

### B.     The *Ashton* Complaint

Like the Consolidated Amended Complaint, the *Ashton* Complaint fails to establish jurisdiction over Saudi Arabia based on the alleged actions of various governmental and nongovernmental charitable organizations. *Ashton* Compl. ¶¶ 3, 9, 45-51. In general, the *Ashton* Plaintiffs rely on the same nine charities and the same three theories of attribution as the Plaintiffs' Executive Committee. *Compare* CAC ¶¶ 105, 109, *with Ashton* Compl. ¶ 9. The *Ashton* Complaint therefore fails for substantially the same reasons already given.

In particular, the *Ashton* Complaint fails to allege facts that, even if supported by evidence, would show day-to-day control by Saudi Arabia over the charities. Like the CAC, the

*Ashton* Complaint asserts that Saudi Arabia or its instrumentalities created the charities[64]; that it funded and supported the charities[65]; that it appointed the charities' leadership, and its officials served in some of those positions[66]; that it set goals and policies for the charities to follow[67]; that charities received guidance from and sought the approval of Saudi Arabia for certain decisions[68]; and that Saudi Arabia had the power to abolish the charities.[69]   None of those allegations is enough.  *See EM Ltd.*, 800 F.3d at 92-94 (hiring and firing leadership, setting goals and policies, and coordinating actions insufficient); *Kirschenbaum*, 830 F.3d at 130 (supervisory role of government official insufficient); *Arch Trading*, 839 F.3d at 204 (nonspecific oversight insufficient); *NML Capital*, 2011 WL 524433, at *3 (government funding insufficient).

---

[64] *See Ashton* Compl. ¶¶ 46(b) (government founded MWL, IIRO, and Rabita Trust), 47(a)-(b) (government established WAMY, and WAMY established BIF), 48(a) (SRC created Al Haramain), 49(c) (government created SHC), 50(b) (government created SJRC); *see also id.* ¶ 51(b) (government "sponsors" SRC).

[65] *See id.* ¶¶ 46(b), (l)-(n), (q)-(t), (v), (y) (MWL, IIRO, Rabita Trust), 47(k)-(m), (o), (q)-(s) (WAMY, BIF), 48(i)-(l), (n) (Al Haramain) (provision of employees, bank accounts, office space, diplomatic passports, unspecified "protections and privileges" for charity employees working abroad, and supplies and equipment); *id.* ¶¶ 46(g), (i) (MWL), 47(e), (p) (WAMY, BIF), 48(e) (Al Haramain), 49(e) (SHC), 50(d) (SJRC), 51(d) (SRC) (financial support); *see also id.* ¶¶ 46(x) (embassy staff mediated disputes among charities), 48(o) (unexplained and unsupported assertion that embassy employees "offered to conceal [Al Haramain] documents from law enforcement agencies").

[66] *See id.* ¶¶ 46(b)-(c), (g), (k) (MWL, IIRO, Rabita Trust), 47(f), (h)-(k) (WAMY, BIF), 48(b)-(c) (Al Haramain), 49(d) (SHC), 51(b) (SRC).

[67] *See id.* ¶ 46(j) (MWL, IIRO, Rabita Trust); *see also id.* ¶ 48(d) (Al Haramain) (assertion of generalized "supervision").

[68] *See id.* ¶¶ 46(e), (w) (MWL, IIRO, Rabita Trust), 47(i) (WAMY, BIF); *see also id.* ¶ 46(u) (assertion that embassies made unspecified "purchasing decisions" for MWL and IIRO).

[69] *See id.* ¶¶ 46(f) (MWL, IIRO, Rabita Trust), 47(d) (WAMY, BIF), 48(g) (Al Haramain), 49(f) (SHC), 50(e) (SJRC), 51(e) (SRC).

The *Ashton* Complaint's sparse allegations of anything resembling day-to-day control are entirely conclusory.[70]  Similarly, formulaic assertions that "it would work a fraud or injustice to regard [the charities] as legal entities separate from Saudi Arabia" (*e.g.*, *Ashton* Compl. ¶ 46) are conclusory and therefore provide no basis for jurisdiction.  Other allegations are simply irrelevant.[71]  In sum, the *Ashton* Complaint offers nothing to disturb this Court's previous conclusion that none of the allegations in this case "show[s] that Saudi Arabia controlled the day-to-day operations of the[ ] charities."  *Terrorist Attacks IX*, 134 F. Supp. 3d at 783.

Even if the *Ashton* Plaintiffs' allegations were sufficient on their face (which they are not), they are unsupported by evidence.  To the extent the *Ashton* Plaintiffs contend that any of their allegations are different from those advanced in the CAC, they must come forward with evidence that would support those purportedly different allegations.  *See supra* Part I.D.  The *Ashton* Complaint gives no indication that they can or will do so.

---

[70] *See id.* ¶¶ 46(e) (MWL, IIRO, and Rabita Trust "received directions from and sought the approval of" government officials "regarding all aspects of their operations"), 47(i) (same, WAMY, BIF), 48(h) (same, Al Haramain), 50(c) (SJRC was "directed and controlled by" a government official); *id.* ¶¶ 47(c) ("the day-to-day operations of WAMY and BIF were *subject to* the control and direction of" government officials) (emphasis added), 48(f) (same, Al Haramain); 49(g) (nonspecific assertion that "Saudi Arabia decided the recipients and amounts of grants made by the SHC"); *see also id.* ¶¶ 46(o) (MWL, IIRO, Rabita Trust) (generalized assertion that charity employees "considered themselves to be employees and officers of Saudi Arabia *subject to* the exclusive control of Saudi Arabia") (emphasis added), 47(n) (same, WAMY, BIF), 48(m) (same, Al Haramain), 49(h) (same, SHC), 50(f) (same, SJRC), 51(f) (same, SRC).

[71] *See id.* ¶¶ 46(d) (MWL controls Rabita Trust), 46(h) (characterization of MWL "as a 'public' institution"), 47(g) (same, WAMY), 46(z) (MWL provided loans to embassy staff), 46(aa) (MWL "had official Saudi Arabia clearance to view classified Saudi Arabia documents"), 51(c) ("the SRC requires that the directors of the SRC include" government officials); *see also id.* ¶ 46(p) (same alleged quotation as CAC ¶ 122); *supra* p. 56 (addressing that quotation).

The *Ashton* Complaint notes that the MWL and the IIRO attempted earlier in the litigation to assert governmental-instrumentality status and foreign sovereign immunity, *Ashton* Compl. ¶ 46(a), but fails to acknowledge that neither ever moved to dismiss on that basis.

## IV.    Jurisdictional Discovery Is Not Warranted

### A.    This Court's Previous Denial of Jurisdictional Discovery Was Correct

When this case was last before this Court, it declined to order jurisdictional discovery. As the Court observed, a "district court 'has wide latitude over the management of discovery . . . but in the FSIA context, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.' " *Terrorist Attacks IX*, 134 F. Supp. 3d at 788 (quoting *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007)) (alteration in original).  Here, Plaintiffs failed to put forward "a prima facie case that this Court has jurisdiction," and, hence, "jurisdictional discovery [wa]s not warranted." *Id.* (citing *Terrorist Attacks III*, 538 F.3d at 96).

The Court further amplified its reasons for denying jurisdictional discovery at the hearing on Saudi Arabia's and the SHC's motion to dismiss, observing that Plaintiffs had failed to identify any issue on which discovery would make Plaintiffs or the Court "more knowledgeable."[72] The Court's observation was correct, especially after the repeated, prolonged government investigations into the 9/11 attacks.  Plaintiffs' attempts to obtain discovery amount to a contention that they can discover new, decisive facts where the 9/11 Commission; the FBI and the CIA; and the 9/11 Review Commission (with the assistance of the FBI) have each rejected the factual basis for their claims. *See supra* Background Part A.  That contention is fanciful.

The Second Circuit recently reaffirmed the broad discretion of district courts over jurisdictional discovery in *Arch Trading*.  That case focused on certain plaintiffs' inability to

---

[72] ECF No. 2986, at 70:19-71:4 ("You don't articulate anything on any issue that you would anticipate that you and the Court are going to be more knowledgeable about if I end up disagreeing with you that your 100-page additional averment of facts, plus the original complaint and what developed over the last decade [is sufficient] . . . . You say if I lose, give me discovery. That's all you're saying.").

meet the *Bancec* standard for disregarding the separate juridical status of certain business entities

owned by instrumentalities of Ecuador.  *See* 839 F.3d at 201-06.  Like Plaintiffs here, the *Arch*

*Trading* plaintiffs argued, "[i]n a final effort to preserve their suit," for jurisdictional discovery

and an evidentiary hearing.  *Id.* at 206.  But the Second Circuit held that the district court was

"within the permissible bounds of its discretion when it concluded that plaintiffs did not present

an adequate basis for expecting that they would be able to rebut the *Bancec* presumption,"

especially in light of their inability to "specify . . . what discovery they might seek."  *Id.* at 207.

That holding underscores the correctness of this Court's previous ruling.

### B.    Jurisdictional Discovery Should Again Be Denied

Plaintiffs have now attempted to make up for their previous failure to identify *any*

relevant topics for discovery by identifying *every* possible topic for discovery.  On June 21,

2017, without leave from the Court, they served 60 numbered document requests on Saudi

Arabia.  Ex. 7.  The extraordinary generality of those requests is illustrated by:

- Request No. 4, which calls for "all documents concerning the funding of the Da'awa Organizations by the Saudi government," *id.* at 9;

- Request No. 9, which calls for documents about "the involvement of the Da'awa Organizations" in any "mosque or Islamic center" funded by Saudi Arabia, *id.* at 10;

- Request No. 16, which calls for all or virtually all "reports, resolutions, or requests" from any "Da'awa Organization[]" to Saudi Arabia, *id.* at 11;

- Request No. 28, which calls for lists of every "imam[] located or stationed outside of the Kingdom whose salar[y] w[as] paid by the Saudi government," *id.* at 14;

- Request No. 41, which calls for "all documents describing the functions, authorities, responsibilities, and/or objectives of the Islamic Affairs offices, da'awa offices, and/or religious attaché's offices of the Kingdom's diplomatic missions," *id.* at 18.

The requests explicitly apply to documents held by every Saudi Arabian ministry, agency,

embassy, or consulate, anywhere in the world, during the period from January 1992 (for some

requests, earlier) to July 2004.  *Id.* at 4.  Further, with respect to the individuals who Plaintiffs

have contended were agents of the Saudi government, Plaintiffs have served 14 numbered requests containing a total of 116 lettered subparagraphs. *See id.* at 18-24 (¶¶ 42-55).

For purposes of the present motion, the problem is not merely that Plaintiffs' requests are ludicrously overbroad and burdensome (though they certainly are) but that they show that Plaintiffs "do not yet know what they expect to find from discovery." *Arch Trading*, 839 F.3d at 207. The requests are neither "circumspect[ ]" nor reasonably calculated "to verify allegations of specific facts crucial to an immunity determination." *EM Ltd.*, 473 F.3d at 486. Instead, the requests are unmistakably intended to generate a basis for new disputes about facts that Plaintiffs speculate they may unearth. The FSIA does not permit such an approach to jurisdictional discovery.

Even if this Court were to view the present remand as giving Plaintiffs another chance to make a case for discovery – which it should not – their overbroad requests show that they should merely fail again. "The FSIA protects defendants from a fishing expedition that seeks to examine the details of the relationships between them and a number of distinct legal entities without any non-speculative basis for believing that those details would establish jurisdiction." *Arch Trading*, 839 F.3d at 207. That observation applies here with equal force – especially given that the commonplace "fishing expedition" is hardly adequate to describe Plaintiffs' requests. A fleet of dragnet trawlers might be a better metaphor.

Plaintiffs thus fall well below the established standards for seeking jurisdictional discovery from Saudi Arabia. Nothing in the text of JASTA indicates an intent to lower those standards. To the extent legislative history is relevant, it suggests that members of Congress

were well aware that district courts would retain ample discretion to limit discovery.[73]  The Court should accordingly deny any jurisdictional discovery.

## V.     Constitutional Limits on Congress's Power Provide Additional Reasons To Dismiss

For the reasons given in Parts II and III, nothing in JASTA enables Plaintiffs to survive either Saudi Arabia's legal or factual challenges.  Because it is not necessary for the Court to address any "constitutional question[s]" about JASTA, it can and should instead rule purely on matters of "statutory construction [and] general law."  *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).  If, however, the Court agrees with Plaintiffs that they have made out a statutory case for jurisdiction, it should then consider whether JASTA is consistent with the Constitution and declare that in important respects it is not.

### A.     If JASTA Were Read To Dictate That Plaintiffs Prevail, It Would Be Unconstitutional Under Article III

Properly read, JASTA changes the legal framework under which courts assess certain claims against foreign sovereigns by creating a new FSIA exception, but leaves the task of applying that new exception to the courts.  *See supra* Part I.  Plaintiffs have, however, contended that Congress "intended JASTA to provide a jurisdictional grant and basis of relief applicable specifically to plaintiffs' claims" and "to eliminate immunity defenses advanced by the Kingdom and the SHC in earlier proceedings."  CAC ¶ 8.  If JASTA were a legislative decision that this Court should decide this specific case in a specific way, it would violate the separation of powers by encroaching on the "judicial Power of the United States," U.S. Const. art. III, which is vested

---

[73] *See* 162 Cong. Rec. S5927 (daily ed. Sept. 21, 2016) (Sen. Cornyn) ("I believe under the oversight of a good Federal judge, they are going to enter the appropriate sort of protective orders necessary to protect people sued against overreaching and fishing expeditions when it comes to discovery, for example."); *id.* at H6025 (daily ed. Sept. 28, 2016) (Rep. Nadler) ("Any government brought before a U.S. court will have every defense available to it, as well as extensive protections and government privileges during discovery to protect against disclosure of its sensitive information.").

solely in the courts.[74]  That constitutional constraint provides an additional reason to interpret

JASTA to commit to this Court the determination whether Plaintiffs have met their burden.

### B.     JASTA Is Unconstitutional as Applied to Plaintiffs Who Were Bound by This Court's Previously Final Judgment as of 2009

As applied to many (indeed, most) Plaintiffs, JASTA unconstitutionally encroaches on

Article III even without directing a result.  That is because of the unusual history of this case, in

which most Plaintiffs were once bound by Article III judgments of this Court (per Judge Casey),

which the Second Circuit directed in *Terrorist Attacks VIII* should be reopened to apply the law

established in *Doe v. Bin Laden*.  As a result, the pre-JASTA law of this case has a special

constitutional status.  Those Plaintiffs who were bound by Judge Casey's original judgments can

proceed only because the Second Circuit determined, under its exclusive Article III authority,

that those judgments should be reopened to apply a particular set of legal rules.  Congress was

not free to step in and create another set of rules entirely.

### 1.     Only the Judicial Branch May Reopen the Final Judgment of an Article III Court

The landmark case of *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), held that

Congress may not "retroactively command[ ] the federal courts to reopen final judgments."  *Id.* at

219.  *Plaut* arose in the wake of the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis*

*& Petigrow v. Gilbertson*, 501 U.S. 350 (1991), which adopted a nationally uniform limitations

---

[74] *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1326 (2016) (reaffirming both Congress's power to "change[ ] the law by establishing new substantive standards" to govern pending or forthcoming cases and Congress's duty under Article III to "entrust[ ] to the [courts the] application of those standards to the facts"); *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 437 (1992) (recognizing that Congress is always free to make new law, but must refrain from "directing particular applications" of that law); *see also Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 82 (2d Cir. 1993) (explaining that, under *Robertson*, a statute is constitutional if it "does not directly interfere with judicial fact finding" and "does not control courts' determinations with respect to whether particular cases satisfy [statutory] requisites").

framework for certain federal securities actions.  *Lampf* led to many actions being dismissed as untimely that were timely when filed under then-binding precedent.  Congress, perceiving those dismissals as inequitable, passed a statute directing such judgments to be reopened and the actions treated as timely.  *See Plaut*, 514 U.S. at 214-15.  The Supreme Court held that Congress's directive was "repugnant to the text, structure, and traditions of Article III," because that Article "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy."  *Id.* at 217-19.

*Plaut* considered and rejected the claim that Congress's encroachment on the judicial power was comparable to a judicial decision to reopen under Rule 60(b).  That Rule, the Court explained, "does not impose any legislative mandate to reopen upon the courts, but merely reflects and confirms the courts' own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity."  *Id.* at 233-34.  Because Rule 60(b) "is simply the recitation of pre-existing judicial power," *id.* at 234-35, it is an exercise of Article III authority, not an Article I intrusion on that authority, and does not offend the separation of powers.

## 2.     The Second Circuit's 2013 Decision To Reopen This Court's Final Judgment Was an Exercise of Article III Power

Under *Plaut*, Congress clearly lacked power to reopen this Court's judgment in favor of Saudi Arabia and the SHC during the period from 2009, when the Supreme Court denied certiorari, to 2013, when the Second Circuit ordered the judgment reopened.  That order was constitutional[75] because it was an exercise of the preexisting Article III power recognized in *Plaut.  See Terrorist Attacks VIII*, 741 F.3d at 356 (invoking Rule 60(b) as "a grand reservoir of

---

[75] Saudi Arabia continues to believe that the order in *Terrorist Attacks VIII* was erroneous and reserves the right to reassert such a claim of error before the Second Circuit or the Supreme Court at a future appropriate procedural stage of this case.

equitable power to do justice in a particular case").  And the Second Circuit exercised that power

because it found that "the interest in finality must yield to the interests of justice."  *Id.* at 358.

The injustice that the Second Circuit perceived was that the courts had "treated cases

arising from the same incident differently."  *Id.*  It found that "inconsistent results for victims of

the same incident pose[] a unique problem of unfairness," *id.* at 359, and that this outcome was

"especially anomalous where, as here, the cases [were] ongoing in the same court, yet subject to

different rules based on this Court's use of the unusual 'mini-en banc' process by which one

panel overrules another," *id.* at 358.  The remedy was to enable Plaintiffs to "obtain review" of

Judge Casey's original "basis for dismissing their claims" – that is, the discretionary-function

exception under 28 U.S.C. § 1605(a)(5) – and to eliminate the "disparity between the *Terrorist*

*Attacks* plaintiffs and the [*Doe*] plaintiff" by remanding for this Court to apply the law as set

forth in *Doe*, *id.* at 359, subject to later appellate review by the Second Circuit.

### 3. Congress's Decision To Apply a New, Different Rule to This Case Violates the Separation of Powers

Read together, *Plaut* and *Terrorist Attacks VIII* point to the conclusion that Congress

cannot constitutionally direct the courts to apply new standards to this case that are different

from either the law applied in *Terrorist Attacks III* or the law applied in *Doe*.  To be sure,

Congress may generally change the law as it applies to pending cases.  *See Bank Markazi*, 136

S. Ct. at 1325.  But Congress may not control the courts' "independent constitutional authority,"

*Plaut*, 514 U.S. at 234, to reopen a final judgment based on the law in effect when that judgment

was rendered.  Where, as here, that independent authority has been exercised (at Plaintiffs'

request) to determine that a case must be decided under a certain set of rules, a contrary decision

by Congress to apply another set of rules entirely intrudes just as deeply on judicial autonomy as

the statute struck down in *Plaut*.

If anything, the intrusion here is deeper.  In *Plaut*, the Court observed that the statute it struck down at least had the benefit of "direct[ing] the reopening of[ ] final judgments in a whole class of cases rather than in a particular suit."  *Id.* at 228.  That, the Court observed, "reduce[d] the perception that legislative interference with judicial judgments was prompted by individual favoritism" – though it did not save the statute, because Article III is "violated when an individual final judgment is legislatively rescinded for even the *very best* of reasons."  *Id.*  Here, although JASTA does not prescribe a specific result, it was certainly meant to provide a litigation advantage for these particular Plaintiffs.  JASTA is therefore offensive to the values that Article III protects as well as to the doctrinal rules that create that protection.

JASTA does not intrude on Article III judicial authority over final judgments as applied to Plaintiffs who filed claims against Saudi Arabia or the SHC for the first time after JASTA was enacted and were never bound by any relevant final judgment.  Those Plaintiffs' claims are nevertheless clearly barred for other reasons.  As for federal ATA claims, the treble-damage liability created by that statute is punitive in nature and so cannot be imposed retroactively.[76]  As for the state-law tort claims, those claims were filed in 2016 or 2017, long after the applicable limitations periods expired.  Because neither of those defenses is jurisdictional, Saudi Arabia respectfully reserves them for further motions practice should that be necessary.

## C.    JASTA Violates Due Process

JASTA also violates Saudi Arabia's due process rights in at least two ways.  *First*, because the FSIA extends personal jurisdiction whenever an exception to foreign sovereign immunity has been established, 28 U.S.C. § 1330(c), it is subject to the constitutional limits

---

[76] *See* U.S. Const. art. I, § 9, cl. 3 (*Ex Post Facto* Clause); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 971-72 (2d Cir. 1985) (interpreting a new statute providing for treble damages against trademark counterfeiters as exclusively prospective, in order to avoid "a potential *ex post facto* problem").

imposed by due process on personal jurisdiction.  *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 313-14 (2d Cir. 1981), *overruled by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009).  The CAC and the *Ashton* Complaint fall short of constitutional requirements because they fail to show (and Plaintiffs cannot prove) that Saudi Arabia expressly aimed any intentional tort at the United States.  *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) ("*Terrorist Attacks VII*") (discussing requirements).  JASTA also violates due process because it purports to impose significant new penalties for past conduct, contrary to the due process right to fair warning.  *See County of Suffolk v. First Am. Real Estate Sols.*, 261 F.3d 179, 195 (2d Cir. 2001).  Saudi Arabia acknowledges that its due process claims are barred by *Frontera Resources*, which held that foreign sovereigns lack due process rights, 582 F.3d at 399-400, and respectfully asserts those claims only to preserve them for later review.

## CONCLUSION

Saudi Arabia's motion to dismiss should be granted.

Respectfully submitted,

*/s/ Michael K. Kellogg*

Michael K. Kellogg
Mark C. Hansen
Gregory G. Rapawy
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900
(202) 326-7999 (fax)
*Attorneys for the Kingdom of Saudi Arabia*

- 75 -

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of August 2017, I caused a copy of the foregoing document to be served electronically via the Court's ECF system on the consolidated MDL docket and on the individual dockets for the following cases, which I understand to include all of the consolidated MDL cases in which Saudi Arabia is named as a Defendant.[*]

> *Federal Insurance Co., et al. v. al Qaida, et al.*, No. 03-cv-6978
> *Vigilant Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 03-cv-8591
> *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-9849
> *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.*, No. 04-cv-1922
> *Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-5970
> *Cantor Fitzgerald Assocs., et al. v. Akida Inv. Co., et al.*, No. 04-cv-7065
> *Pacific Employers Insurance Co., et al. v. Kingdom of Saudi Arabia, et al.*,
>     No. 04-cv-7216
> *Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-7279
> *Beazley Furlonge Ltd. v. Saudi Binladin Group, Inc., et al.*, No. 16-cv-7456
> *Bowrosen, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8070
> *McCarthy, et al. v. Kingdom of Saudi Arabia*, No. 16-cv-8884
> *Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9663
> *Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-9937
> *Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-117
> *DeSimone v. Kingdom of Saudi Arabia*, No. 17-cv-348
> *Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-450
> *Ashton, et al. v. Kingdom of Saudi Araba*, No. 17-cv-2003
> *The Underwriting Members of Lloyd's Syndicate 53, et al. v. Kingdom of Saudi Arabia,*
>     *et al.*, No. 17-cv-2129
> *The Charter Oak Fire Insurance Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-2651
> *General Reinsurance Corp., et al. v. Kingdom of Saudi Arabia*, No. 17-cv-3810
> *Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3887
> *Arrowood Indemnity Co. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-3908
> *Abrams, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-4201
> *Abtello, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5174
> *Aasheim, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-5471

/s/ Michael K. Kellogg
Michael K. Kellogg

---

[*] A previous version of this Certificate of Service, filed on the MDL docket and on other individual case dockets earlier today, stated that Saudi Arabia is unable to file in *Continental Casualty* and *Charter Oak*.  The electronic filing difficulty we were experiencing appears to have been resolved.